NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11775

COMMONWEALTH  vs.  CLAUZELL JONES.

Worcester.     March 2, 2015. - September 21, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Rape.  Rape-Shield Statute.  Deoxyribonucleic Acid.
    Constitutional Law, Confrontation of witnesses, Public
    trial.  Evidence, Expert opinion, Scientific test, Hearsay,
    Chain of custody, Sexual conduct.  Witness, Expert.
    Practice, Criminal, Confrontation of witnesses, Public
    trial, Instructions to jury.


Indictments found and returned in the Superior Court
Department on March 17, 2009.

The cases were tried before David Ricciardone, J., and a
motion for a new trial, filed on July 5, 2013, was heard by him.

The Supreme Judicial Court granted an application for
direct appellate review.


Kathleen M. O'Connell for the defendant.
Ellyn H. Lazar-Moore, Assistant District Attorney, for the
Commonwealth.
Brad A. Compston, for Massachusetts Association of Criminal
Defense Lawyers, amicus curiae, submitted a brief.


LENK, J.  The defendant was indicted on charges of rape, in

violation of G. L. c. 265, § 22 (b), and furnishing alcohol to a minor, in violation of G. L. c. 138, § 34. At trial, the defendant testified both that his sexual contact with the victim did not involve penetration and that it was consensual. To establish the element of penetration necessary to sustain a conviction of rape, the Commonwealth offered, in addition to the victim's testimony, results of deoxyribonucleic acid (DNA) testing that purportedly identified the defendant's saliva on "intimate" swabs taken from the victim's vagina. To prove that the sexual contact was nonconsensual, the Commonwealth offered, among other evidence, testimony concerning the victim's conduct shortly after the alleged rape occurred. The defendant was convicted by a Superior Court jury in May, 2011, on both indictments.

On appeal, the defendant argues that the judge erred in allowing the Commonwealth to introduce, through the testimony of an expert witness who was not present when the victim's "rape kit" examination was performed, evidence concerning how the various swabs that the expert tested were collected. The defendant further contends that the judge violated his right to a public trial by holding, pursuant to G. L. c. 233, § 21B (rape shield law), an in camera hearing to determine the admissibility of evidence relating to the victim's prior sexual contact with the individual to whom the victim first reported the alleged

rape (first complaint witness). Finally, the defendant challenges the judge's decision, also based on the rape shield law, to prohibit defense counsel from introducing evidence regarding the victim's prior sexual relationship with the first complaint witness, and challenges the jury instructions as inconsistent with a decision issued by this court after the defendant's trial.

We hold that the judge erred in permitting the expert to testify about how the various swabs she tested had been collected, and that the preserved error was prejudicial. We therefore vacate the defendant's convictions and remand for a new trial. We further conclude that the judge erred in closing the rape shield hearing without conducting the four-prong analysis required for court room closures under Waller v. Georgia, 467 U.S. 39, 48 (1984) (Waller). Because we are ordering a new trial based on the erroneously admitted expert testimony, we address only briefly the defendant's two remaining arguments.

1. Background. We summarize the evidence presented at trial, with particular focus on the evidence relevant to the defendant's arguments on appeal. We reserve certain substantive and procedural facts for later discussion.

On October 17, 2008, the victim, P.B.,[1] then a high school senior, attended a party at the defendant's house in Gardner. Also in attendance were several other high school age friends of the victim: Rachel, Tim, and the defendant's son, Chris.[2] The victim and Rachel testified that, shortly after they arrived, they drank some beer, followed by "nips," small containers of flavored alcoholic beverages. The group then played a game of "strip poker," although the victim testified that she only took off her sweatshirt and possibly her socks. The defendant provided marijuana, which everyone smoked.

The defendant then offered P.B. and Rachel shots of rum, which they accepted. He served the rum out of wine glasses. Both P.B. and Rachel testified that they saw some type of pink substance in the glasses before they drank.

After drinking the rum, both the victim and Rachel became violently ill. Although the victim had consumed alcohol before, she testified that she had never felt as sick as she did that night. She vomited in the bathroom for approximately ten minutes, and then went limp. The other attendees picked the victim up from the bathroom floor and placed her on a couch in the defendant's bedroom. While she was being carried, her head struck the doorframe.

---

[1] A pseudonym.

[2] A pseudonym.

When the victim awoke, she was lying naked on her stomach on the bed with the defendant behind her. She felt the defendant's fingers in her vagina; she then felt the defendant's penis in her vagina. When she turned over, he jumped out of the bed and announced that he had to go to the bathroom. After the victim put her clothes on, the defendant emerged from the bathroom wearing a robe. The victim said, "I don't want to be here. I'm leaving."

The victim entered the living room and climbed onto the couch where Tim was sleeping, placing herself between the couch and Tim's legs. Tim said, "Nah," pushed the victim away, and moved to another seat. At that point, the victim said, "[Chris]'s dad just fucked me," and began to cry. The victim then spent forty-five minutes to one hour making telephone calls and sending text messages, trying to contact someone to pick her up from the defendant's house.

Sometime between 4 and 4:30 A.M., the victim finally reached a school friend, Alexis. The victim left the defendant's house and went to a nearby twenty-four hour pharmacy. Alexis, in a vehicle driven by her mother, arrived to pick up the victim. They found her sitting on the curb outside the pharmacy, crying.

Alexis's mother urged the victim to go to the hospital. The victim initially declined. Instead, she went into Alexis's

room, and the two talked for a while.  Another school friend, Ellen, along with Ellen's boy friend, then came to get the victim and drove her to Ellen's house.  There, the victim was picked up by her boy friend, Chad, and taken to her house.

That afternoon, Chad took the victim to the hospital.  They first went to a hospital in Fitchburg.  From there, they were directed to a hospital in Leominster, where a sexual assault nurse examiner (SANE) performed a "rape kit" examination on the victim.

At trial, the defendant, testifying in his own defense, offered a different account of the events of the evening.  According to the defendant's testimony, after the victim was laid on his bed (rather than on the couch in his bedroom, as other witnesses testified), the group continued drinking.  The defendant then went into his room to watch television.  He sat down on the bed next to the victim, who was sleeping and was still fully clothed.  After the defendant watched television for fifteen or twenty minutes, the victim woke up.  She rolled over and said, "Hey, what's up?"  The pair watched television together for about twenty minutes.  The victim then invited the defendant to rub her back.  He began rubbing her back, and then began touching her buttocks.  The victim pressed her buttocks against the defendant's genitals, and removed her pants.  The defendant licked his finger, reached around, and "touched her

vagina." The defendant testified that he touched the "top part" of her vagina, that the touch was very brief, that he "felt mostly hair," and that he did not feel either "the lips of her vagina" or "a wet part of her vagina."

The defendant then announced that he had to go to the bathroom. When he returned from the bathroom, the victim was on the couch in the living room with Tim. The defendant testified that he believed that the victim was interested in having sex, and that he too wanted to have sex. He claimed, however, that he never penetrated her vagina, either with his penis or with his finger.

The Commonwealth offered the testimony of two experts that contradicted the defendant's account. The first expert, a chemist at the State police crime laboratory, testified that she performed testing on three swabs purportedly collected from the victim during the "rape kit" examination at the hospital in Leominster: a genital swab, which the expert testified was taken from "the outside of the genital area"; a vaginal swab, which the expert described as "an intimate swab of the vagina"; and a peri-anal swab, which the expert testified was taken "from the outside of the anal area." The expert indicated that all of the swabs tested negative for semen agellin. The vaginal and genital swabs, however, tested positive for human alpha-amylase, commonly known as saliva.

The second expert was also a chemist at the State police crime laboratory. She testified that she performed DNA analysis on the saliva recovered from the vaginal and genital swabs. She indicated that the DNA profile obtained from the vaginal swab matched a DNA sample acquired from the defendant. She testified that, based on currently available databases, the DNA profile obtained was "not expected to occur more frequently than 1 in 1,065 Caucasian males, 1 in 936 African-American males, 1 in 561 Hispanic males, and 1 in 198 Asian males."

After the defendant's convictions on both indictments, he moved for a new trial on the basis of the court room closure during the rape shield hearing. Following an evidentiary hearing, the motion judge, who was also the trial judge, denied the defendant's motion. The defendant appealed from his convictions and from the denial of his motion for a new trial. We granted the defendant's petition for direct appellate review.

2. Discussion. a. Confrontation clause and common-law evidentiary rules. The Commonwealth did not offer at trial the testimony of the nurse at the hospital in Leominster who conducted the "rape kit" examination. Instead, the judge permitted the Commonwealth's first expert witness, who was not present during the examination and had no apparent connection to the hospital at which the swabs were taken, to testify to her "understanding" of how the three swabs had been collected. That

understanding was apparently based, in part, on information the expert learned from the "evidence collection inventory list" purportedly completed by the nurse who conducted the "rape kit" examination.

The defendant objected to the admission of the expert's testimony "identify[ing] what swab came from where." Defense counsel argued that it was "improper" for the first expert "to testify to facts for which [she] [was not] present," that defense counsel had "no ability to cross examine" the expert as to "how that swab was taken, or whether it was taken with the correct procedure," and that the admission of the testimony would violate the defendant's right to be confronted with witnesses against him under the Sixth Amendment to the United States Constitution. In response, the prosecutor did not assert that the nurse was unavailable to testify. Indeed, she indicated that the defense had the nurse on the witness list. She further indicated that she would request a continuance to secure the nurse's presence if the judge deemed the nurse's testimony necessary, but urged the judge to reject the defendant's confrontation clause argument. The judge overruled the defendant's objections and allowed the testimony.

The Sixth Amendment provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." Article 12

of the Massachusetts Declaration of Rights similarly protects a criminal defendant's right "to meet the witnesses against him face to face."  Although art. 12 "has been interpreted to provide a criminal defendant more protection than the Sixth Amendment in certain respects, . . . when the question involves the relationship between the hearsay rule and its exceptions, on the one hand, and the right to confrontation, on the other hand, the protection provided by art. 12 is coextensive with the guarantees of the Sixth Amendment" (citation and quotation omitted).  Commonwealth v. Nardi, 452 Mass. 379, 388 (2008).

In Crawford v. Washington, 541 U.S. 36 (2004) (Crawford), the United States Supreme Court swept aside its prior approach to the confrontation clause, under which the admission of hearsay statements against a criminal defendant did not violate the confrontation clause so long as the statements "f[ell] within a firmly rooted hearsay exception" or showed "particularized guarantees of trustworthiness."  Ohio v. Roberts, 448 U.S. 56, 66 (1980).  See id. at 65 n.7.  Instead, the Court held in Crawford, supra at 68, that, "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required:  unavailability and a prior opportunity for cross-examination."

Although the hearsay evidence at issue in Crawford, supra at 38-42, involved statements to police officers, the rule

articulated in the case called into question the admissibility at criminal trials of the results of scientific or forensic testing. See Williams v. Illinois, 132 S. Ct. 2221 (2012); Bullcoming v. New Mexico, 131 S. Ct. 2705 (2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). During the Ohio v. Roberts era of confrontation clause jurisprudence, such results had been admitted routinely, even without the opportunity to cross-examine the analyst who actually conducted the testing, on the theory that the results showed particularized guarantees of trustworthiness. The Court's holding in Crawford eliminated that rationale, potentially suggesting that any person who played a role in the forensic or scientific testing of evidence must be called to testify before the prosecution may present expert opinion testimony regarding the evidence. See Melendez-Diaz v. Massachusetts, supra at 332 (Kennedy, J., dissenting).

This court responded to the difficulty posed by forensic or scientific opinion testimony in Commonwealth v. Greineder, 464 Mass. 580, 593 (Greineder), cert. denied, 134 S. Ct. 166 (2013). There we held that, under our common-law evidentiary rules, "[e]xpert opinion testimony, even if based on facts and data not in evidence, does not violate the right of confrontation," provided that the facts and data "are independently admissible and are a permissible basis for an expert to consider in formulating an opinion," and that two further conditions are met

(citation omitted).  Id. at 583, 584.  See Department of Youth Servs. v. A Juvenile, 398 Mass. 516, 527-528 (1986).  First, the expert must "not present on direct examination the specific information on which he or she relied"; second, the expert witness must have the capacity to "be meaningfully cross-examined about the reliability of the underlying data." Greineder, supra at 583, 595.  We characterized this evidentiary rule as "more protective . . . than the [United States] Supreme Court would require," and observed that, by fashioning such a rule, we "necessarily satisfy the mandates of the Sixth Amendment."  Id. at 593.

Our common-law evidentiary rules, therefore, afford the defendant a choice.  If the defendant challenges the reliability of the expert's underlying data on cross-examination, then "basis evidence that is hearsay may become available to the jury to evaluate a witness's credibility."  Id. at 600.  By contrast, "[i]f a defendant does not open the door on cross-examination to the hearsay basis of an expert's opinion, then the jury may properly accord less weight to the expert's opinion" due to the absence of any testimony providing the basis for the expert's opinion.  Id.

Our common-law evidentiary rules decisively resolve this case.  In labeling the various swabs and completing the "rape kit" "inventory list," the nurse essentially made a series of

factual statements concerning how the various swabs were collected.  The purpose of a "rape kit" is to gather forensic evidence for use in a criminal prosecution.  See What is a Rape Kit?, Rape, Abuse & Incest National Network, https://rainn.org/get-information/sexual-assault-recovery/rape-kit [http://perma.cc/R7AN-NJM5].  Therefore, these statements were plainly testimonial.  See Commonwealth v. Nardi, 452 Mass. 379, 394 (2008) (evidence is testimonial where "a reasonable person in [the speaker's] position would anticipate his [findings and conclusions] being used against the accused in investigating and prosecuting a crime" [citation omitted]).  See also Ohio v. Clark, 135 S. Ct. 2173, 2181 (2015) (rejecting confrontation clause claim where hearsay statements at issue "clearly were not made with the primary purpose of creating evidence for [the defendant's] prosecution"); Davis v. Washington, 547 U.S. 813, 822 (2006) (statements to police officers are "testimonial when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution").  And because the Commonwealth's first expert then recited these testimonial statements to the jury, they also were plainly hearsay.  Although the prosecutor suggested at trial that the first expert's recitation was permissible because the

expert merely was "identif[ying] . . . the hearsay material on which . . . she relied," Commonwealth v. Bizanowicz, 459 Mass. 400, 411 (2011), the expert obviously was "testifying to, and asserting the truth of, [the] statements recorded by" the nurse. Commonwealth v. Nardi, supra at 392. Indeed, the very relevancy of both experts' testimony was dependent upon the jury accepting the nurse's assertions about how and from where the various swabs had been collected, relayed through the first expert, for the truth of the matter asserted. Without the nurse's statements linking the swabs to the examination performed on the victim, the Commonwealth merely would have presented two experts who performed various tests on three swabs -- origin unknown -- and identified on two of them saliva containing DNA that matched the defendant's DNA.

Because the challenged parts of the first expert's testimony constituted testimonial hearsay, their admission was permissible only if it complied with the rule articulated in Greineder. It did not.

First, the Greineder rule only allows an expert, on cross-examination, to present the specific underlying facts, derived from hearsay statements, on which the expert relied. The challenged testimony at issue here, however, came in on direct examination. Indeed, the expert's statements concerning how the various swabs had been collected were made near the beginning of

her testimony, because the import of the test results that she later described hinged on those statements.

Second, the Greineder rule demands that "the expert witness . . . can be meaningfully cross-examined about the reliability of the underlying data."  Greineder, supra at 595. See Commonwealth v. Tassone, 468 Mass. 391, 392 (2014) (Tassone); Commonwealth v. Barbosa, 457 Mass. 773, 790-791 (2010), cert. denied, 131 S. Ct. 2441 (2011).  Greineder responded to a recurrent situation involving forensic and scientific evidence whereby the testifying analyst, in formulating her expert opinion, draws upon testing conducted and results reached by other analysts, who do not testify.  See Greineder, supra at 582.  We held that such testimony is permissible provided that the testifying analyst "reviewed the nontestifying analyst's work, . . . conducted an independent evaluation of the data," and "then expressed her own opinion, and did not merely act as a conduit for the opinions of others" (quotation and citation omitted).  Id. at 595.

This case presents a significantly different scenario from that involved in Greineder or in the United States Supreme Court's confrontation clause decisions involving forensic or scientific testimony.  The case does not involve a situation where a testifying analyst reviewed and then built on the findings of a nontestifying analyst in reaching his or her

expert opinion.  See Department of Youth Servs. v. A Juvenile, 398 Mass. at 527-528.  Instead, the hearsay testimony at issue here involved the circumstances under which the evidence that the testifying expert tested was collected in the first place. For the Commonwealth's expert to testify to how the swabs were collected from the victim would be akin to allowing a chemist to testify to the chemist's "understanding," based on information relayed to the chemist in a report drafted by nontestifying police officers, that a substance later determined to be cocaine had been found in the defendant's trouser pocket.

Furthermore, the Commonwealth's expert did not "review" or make an "independent evaluation" of the nurse's representations indicating that a given swab was collected from a particular part of the victim's body.  Having no personal knowledge of the process by which the swabs were collected, the expert lacked any capacity to do so.  Under these circumstances, the expert could not be "meaningfully cross-examined about the reliability" of the nurse's representations concerning the origins of the swabs. Greineder, 464 Mass. at 595.

The expert also lacked any capacity to address the chain of custody and evidence-handling protocols relevant to the process by which the swabs were collected.  See Tassone, 468 Mass. at 401.  In Tassone, supra at 394, the Commonwealth's expert purportedly had conducted an "independent review" of a DNA

profile generated by a nontestifying analyst from a swab taken from eyeglasses found at the scene of a crime, before concluding that that profile matched the defendant's DNA profile.  We nevertheless held that, because the testifying expert was "a chemist at the State police laboratory," while the DNA profile had been generated by Cellmark, an outside laboratory, the defendant was deprived of a "meaningful opportunity to cross-examine the expert as to the reliability of the underlying facts or data."  Id. at 400, 401.  The expert, we observed, "was not in a position to confirm that the DNA profile was from the eyeglasses swab; she knew only that Cellmark said that it was." Id.

Here, similarly, the expert, by her own account, had "no idea how [the swabs] were collected."  Consequently, the defendant was deprived of any opportunity to question the expert about the protocols in place to ensure that the swabs were properly collected and labeled.  Simply put, the expert took it as given that the swabs were collected as the nurse said they were, and then relayed these statements to the jury.  Where the only answer that the expert can give to questions concerning the chain of custody and evidence-handling protocols is "I don't know," a defendant has been deprived of the opportunity for meaningful cross-examination.

We have observed that a meaningful opportunity to cross-

examine an expert witness regarding chain of custody and evidence-handling protocols is especially crucial in relation to DNA evidence. "[W]ith DNA analysis, the testing techniques are so reliable and the science so sound that fraud and errors in labeling or handling may be the only reasons why an opinion is flawed." Commonwealth v. Barbosa, 457 Mass. at 790. By introducing the critical facts concerning how the swabs were collected from the victim through the testimony of an expert witness who played no role in the collection process whatsoever, therefore, the Commonwealth sidestepped the one aspect of the forensic evidence presented in this case that was likely most "meet for cross-examination." Bullcoming v. New Mexico, 131 S. Ct. 2705, 2714 (2011).[3]

Because defense counsel objected to the first expert's testimony, we must determine "whether the error was nonprejudicial, that is whether the error did not influence the jury, or had but very slight effect" (quotation and citation

---

[3] As a general rule, information concerning how such swabs were collected should be admitted through the testimony of a person, such as, without limitation, the nurse or the victim, who has personal knowledge of the specific "rape kit" examination at issue. We leave for another day the question whether evidence concerning the collection of the swabs could be admitted through the testimony of a person who lacks personal knowledge of the specific "rape kit" examination, but who is familiar with the general procedures and protocols ordinarily employed at a given facility in connection with the conduct of a "rape kit" examination.

omitted).  Tassone, 468 Mass. at 403.  We conclude that the error was prejudicial.  The defendant testified that he licked his finger and touched the outside of the victim's vagina, but did not penetrate her or come into contact with her vulva or labia, as required for a conviction of rape.  See Commonwealth v. Donlan, 436 Mass. 329, 336 (2002).  The victim, by contrast, testified that the defendant penetrated her vagina with his finger and penis.  Because the expert testified that the defendant's saliva was found on "an intimate swab" taken from the victim's vagina, the expert's testimony supported the victim's account and undermined the defendant's account on a key aspect of the Commonwealth's case.[4]  During closing argument, the

---

[4] Because the testimonial hearsay related to a key factual dispute, this case differs from those decisions in which we have determined that testimonial hearsay was improperly admitted, but did not necessitate a new trial.  In a few of these cases, the defendant objected, but this court concluded that the error was harmless beyond a reasonable doubt.  See Commonwealth v. Whitaker, 460 Mass. 409, 421-422 (2011); Commonwealth v. Rogers, 459 Mass. 249, 264-266, cert. denied, 132 S. Ct. 813 (2011).  In most, however, the defendant failed to object, causing us to review only for a substantial likelihood of a miscarriage of justice.  Furthermore, in most of these cases, the hearsay evidence at issue was an autopsy report, and the cause of death was not a contested issue at trial, leading us to affirm despite the error.  See Commonwealth v. Emeny, 463 Mass. 138, 144-146 (2012); Commonwealth v. Phim, 462 Mass. 470, 479-480 (2012); Commonwealth v. Walker, 460 Mass. 590, 594 n.6 (2011); Commonwealth v. Housen, 458 Mass. 702, 710 (2011); Commonwealth v. Mercado, 456 Mass. 198, 211 (2010); Commonwealth v. Taylor, 455 Mass. 372, 377-378 (2009); Commonwealth v. Pena, 455 Mass. 1, 15 (2009); Commonwealth v. Hensley, 454 Mass. 721, 732-734 (2009).  Compare Commonwealth v. Durand, 457 Mass. 574, 582-588 (2010) (reversing where medical examiner's testimony was

prosecutor argued that the defendant's testimony reflected an effort "to come up with an explanation that's short of penetration to get the saliva there," and attacked that explanation as inconsistent with the DNA test results, asking, "if he just touched her, then how did the saliva get inside her vagina?"

Had the nurse or some other individual with knowledge of the process by which the swabs were collected testified, a skillful defense attorney could have asked questions aimed at challenging the integrity of the evidence-gathering process. Defense counsel might have questioned, for instance, whether the purportedly "intimate" swab taken from within the victim's vagina could have come into contact with the "external" genital swab, thereby creating the false impression that the defendant's saliva was contained within the victim's vagina.  In responding to such questions, the nurse or other individual would have made "representations . . . relating to past events and human actions" that are "not revealed in raw, machine-produced data." See Bullcoming v. New Mexico, 131 S. Ct. at 2714.  Such questioning has prompted expert witnesses to realize that they had made labeling or handling errors, thereby preventing convictions based on incorrect or misleading DNA test results.

---

improperly admitted, issue was preserved, and "[t]he cause of death was very much a disputed issue").

See Williams v. Illinois, 132 S. Ct. 2221, 2264 (2012) (Kagan, J., dissenting).

Of course, faced with these questions, the nurse or other individual might have provided answers that convinced the jury of the reliability and integrity of the evidence-collection process. But that is precisely why our evidentiary rules demand an opportunity meaningfully to cross-examine the expert regarding chain of custody and evidence-handling protocols. By requiring that opportunity, our common-law evidentiary rules, like the confrontation clause itself, "command[] . . . that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." See Crawford, 541 U.S. at 61. Because the process by which the swabs were collected was crucial to the Commonwealth's case, and because, as a result of the trial judge's error, the defendant was deprived of the opportunity for cross-examination regarding that process, we conclude that the error was prejudicial and requires a new trial. See Tassone, 468 Mass. at 402-404.

Finally, we do not agree with the Commonwealth's suggestion that the defendant waived his confrontation clause claim by agreeing to the admission of the unredacted inventory list from the defendant's "rape kit" examination. It is true that, before the expert testified, the judge allowed the victim's medical records to be marked as exhibits, and these records included the

inventory list purportedly completed by the nurse who examined the victim.  At that time, however, defense counsel observed that the medical records had "to be redacted significantly." The Commonwealth agreed "there are redactions," and indicated that "they won't go to the jury until counsel and I have agreed on the redactions."

Later, when the Commonwealth's expert testified, defense counsel made clear that she believed that it would violate the confrontation clause for the expert to testify to facts that were based in part on information learned from the inventory list.  Defense counsel stated that, "if [the prosecutor] wanted to put on a case which wouldn't raise questions about confrontation, she would have put on the SANE [i.e., the nurse] . . . as her witness.  She didn't."  Defense counsel further objected that "[t]he only way it's coming in is through this expert."  The judge acknowledged that "there could be testimony from the person who did the swabbing that 'I took this swab from the defendant and the vaginal area of the complaining witness,'" but rejected defense counsel's confrontation clause argument.  The judge noted defense counsel's continuing objection to the evidence.

Defense counsel later apparently agreed to the admission of the medical records, including the inventory list.  Counsel's apparent agreement to allow the inventory list to be presented

to the jury, however, occurred long after the expert had already testified -- over defense counsel's strenuous objection -- to her "understanding" regarding how the swabs had been collected. While the better practice would have been for defense counsel to renew her objection to the information concerning the collection of the swabs, we do not regard the subsequent admission of the unredacted inventory list as a retroactive waiver of the objection that defense counsel clearly voiced earlier.

The inventory list, moreover, did not include the actual content regarding how the swabs were collected. The list, for instance, simply indicates "Vaginal Swabs and Smear" with a check mark next to it, without describing the swab as an "intimate swab of the vagina." By testifying to her "understanding" concerning how the swabs were collected, therefore, the Commonwealth's expert testified to underlying facts of which she had no personal knowledge, and that went beyond the facts later admitted in evidence via the inventory list. For both of these reasons, we reject the Commonwealth's waiver argument.

b. Public trial right. At trial, the defendant sought to offer evidence of the victim's prior sexual relationship with Tim, the first complaint witness. Defense counsel argued that this prior sexual relationship was "directly related to [the victim's] motivation to lie." Defense counsel contended that

the victim's conduct, in climbing onto the couch where Tim was sleeping, constituted a sexual advance. Tim's apparent rejection of that sexual advance, defense counsel claimed, gave the victim an incentive to fabricate her rape allegation against the defendant. The Commonwealth countered that the proposed testimony was inadmissible under the rape shield law.

The judge held an evidentiary hearing on the proposed testimony. Before the hearing began, the prosecutor asked that the court room be closed, contending that the rape shield statute required that the hearing "be done in camera." The judge agreed, and "ask[ed] the court officers, for the purposes of this rape shield hearing, to make sure that no member of the public comes in for a short period of time." Defense counsel requested "that Mr. Jones's family be allowed to be with him during this stage of the trial." The judge asked, "They would be members of the public, no?" Defense counsel argued that, as "with any trial proceeding, [the defendant] should have the right to have the support of his family there." The parties then disputed the purpose of the rape shield statute, with the defendant contending that its purpose is to guard against evidence introduced for the "improper purpose" of arguing that the victim's lack of chastity established consent, rather than for the more general purpose of "protecting the privacy of the alleged victim." The judge, after noting that the statute

specifically provides for an "in camera hearing," denied the defendant's request and closed the court room.

Following his conviction, the defendant moved for a new trial on the basis of the court room closure during the rape shield hearing. In support of his motion, the defendant submitted affidavits from various individuals who indicated that they were excluded from the court room during the hearing. The Commonwealth stipulated that potential observers were excluded from the hearing, and did not argue that the public trial issue was unpreserved. The motion judge denied the motion, concluding that the court room was closed properly during the rape shield hearing in accordance with the requirements of G. L. c. 233, § 21B, the rape shield law.

The rape shield law provides:

> "Evidence of the reputation of a victim's sexual conduct shall not be admissible in an investigation or proceeding before a grand jury or a court of the commonwealth for a violation of [certain sexual offense statutes]. Evidence of specific instances of a victim's sexual conduct in such an investigation or proceeding shall not be admissible except evidence of the victim's sexual conduct with the defendant or evidence of recent conduct of the victim alleged to be the cause of any physical feature, characteristic, or condition of the victim; provided, however, that such evidence shall be admissible only after an in camera hearing on a written motion for admission of same and an offer of proof. If, after said hearing, the court finds that the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim, the evidence shall be admitted; otherwise not. If the proceeding is a trial with jury, said hearing shall be held in the absence of the jury. The finding of the court shall be in writing and filed but shall not be made

available to the jury."

G. L. c. 233, § 21B.  In addition to the express exceptions to inadmissibility articulated in the statute, this court has determined "that other exceptions may arise under the United States Constitution and the Massachusetts Declaration of Rights."  Commonwealth v. Mountry, 463 Mass. 80, 86 (2012).  One of these exceptions applies where evidence that otherwise would be barred by the statute "is relevant to the question of a victim's bias or motive to fabricate."  Id.

The motion judge, who was also the trial judge, rejected the defendant's contention "that G. L. c. 233, § 21B[,] allows for public attendance at its required 'in camera hearing,'" and concluded that this mandatory closure rule was permissible.  We agree with the motion judge that the requirement of G. L. c. 233, § 21B, for "an in camera hearing" indicates that the court room must be closed during the proceeding.  The term "in camera" derives from the Latin meaning "in a chamber," and may denote a proceeding taken either "[i]n the judge's private chambers" or "[i]n the court room with all spectators excluded." Black's Law Dictionary 878 (10th ed. 2010).  Under either definition, therefore, an "in camera hearing" denotes one from which the public is excluded.

While we agree with the motion judge that the statute provides for mandatory closure of the rape shield hearing, we

conclude that the mandatory closure rule is impermissible. In reaching that conclusion, we emphasize at the outset that we do not question the compelling interest underlying the rape shield statute. That statute, like similar statutes in other States, was enacted in response to the pervasive practice of attacking a victim's testimony that she did not consent to sex with evidence of the victim's "lack of chastity." Commonwealth v. Joyce, 382 Mass. 222, 227-228, 231 (1981) ("The major innovative thrust of the rape-shield statute is found in the first sentence, which reverses the common law rule under which evidence of the complainant's general reputation for unchastity was admissible"). See Berger, Man's Trial, Woman's Tribulation: Rape Cases in the Courtroom, 77 Colum. L. Rev. 1, 17 (1977) (Berger). And although "[t]he primary purpose of the statute is to prevent a general credibility attack of a victim with evidence of his or her promiscuity," Commonwealth v. Mountry, 463 Mass. at 86, the statute's requirement for an "in camera hearing" on the admissibility of evidence of sexual conduct reflects a legitimate interest in guarding against the public "revelation of facts that can only smear" a rape victim, and in "protecting complainants and encouraging victim cooperation in bringing suspected assailants to trial." See Berger, supra at 96.

We also stress the narrowness of our holding: we do not

determine that this particular rape shield hearing should have been open to the public, much less that all rape shield hearings must be open to the public.  Instead, we merely conclude that, before a judge may order the court room closed for a rape shield hearing, the judge must make a case-by-case determination in accordance with the four-prong framework articulated by the United States Supreme Court in Waller, 467 U.S. at 48, decided after the enactment of the rape shield law at issue here.

The Sixth Amendment, which applies in State court proceedings, guarantees to the accused "in all criminal proceedings . . . the right to a speedy and public trial."  See In re Oliver, 333 U.S. 257, 267 (1948).  The closing of a criminal proceeding to the public also may implicate rights guaranteed by the First Amendment to the United States Constitution.  See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 106 (2010).  "[T]he explicit Sixth Amendment right of the accused," however, "is no less protective of a public trial than the implicit First Amendment right of the press and public." Waller, supra at 46.  Because the public trial right is constitutionally based, in reviewing an asserted violation of the right, the court "exercise[s] its own judgment on the ultimate factual as well as legal conclusions" (citation omitted).  Commonwealth v. Cohen (No. 1), supra at 105.

The Sixth Amendment right to a public trial "covers the

entire trial, including the impaneling of the jury and the return of the verdict" (footnote omitted). 6 W.R. LaFave, J.H. Israel, N.J. King, & O.S. Kerr, Criminal Procedure § 24.1(a) (3d ed. 2007). See United States v. Sorrentino, 175 F.2d 721, 722 (3d Cir. 1949). Even where the public trial right attaches to a given proceeding, however, the right is "not absolute." Globe Newspaper Co. v. Superior Court for the County of Norfolk, 457 U.S. 596, 606 (1982) (Globe Newspaper Co.). A court room closure may be permissible, provided the party seeking the closure satisfies the four-part test articulated in Waller, 467 U.S. at 48: "[1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced; [2] the closure must be no broader than necessary to protect that interest; [3] the trial court must consider reasonable alternatives to closing the proceeding; and [4] it must make findings adequate to support the closure."

Neither the United States Supreme Court nor this court has articulated a clear test for determining the threshold question whether a given proceeding constitutes part of the "trial" for purposes of the public trial right. In Waller, supra, the United States Supreme Court determined that the public trial right attaches to a pretrial suppression hearing. In reaching that conclusion, the Court identified several values that the public trial right serves. Id. at 46-47. Various United States

Circuit Courts of Appeals have enumerated these values, and turned to them to determine whether the public trial right attaches to a given proceeding.

These courts have determined that the public trial right attaches to a given proceeding where recognition of the right would serve "1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." Peterson v. Williams, 85 F.3d 39, 43 (2d Cir. 1996). See United States v. Rivera, 682 F.3d 1223, 1229 (9th Cir. 2012); United States v. Perry, 479 F.3d 885, 890-891 (D.C. Cir. 2007); Braun v. Powell, 227 F.3d 908, 918-919 (7th Cir. 2000). Based on these factors, these courts have found violations of the public trial right where the court room was closed "during [a] hearing" at which "matters of vital importance were discussed and decided." United States v. Rivera, supra at 1232 (finding violation of public trial right where defendant's family members were excluded from sentencing proceedings). By contrast, courts have rejected Sixth Amendment challenges based on court room closures during "routine jury administrative matters," United States v. Ivester, 316 F.3d 955, 960 (9th Cir. 2003) (finding no violation of public trial right where judge closed court room to address jurors' concerns about their safety), or where the closure was

"so trivial as not to implicate the right to a public trial." Carson v. Fischer, 421 F.3d 83, 92 (2d Cir. 2005) (no violation of public trial right where judge excluded defendant's ex-mother-in-law from court room during testimony of single witness).  See Braun v. Powell, supra at 919 (no violation where judge excluded former member of venire from trial); Peterson v. Williams, supra at 41 (no violation where judge inadvertently closed court room during defendant's testimony, which lasted approximately fifteen to twenty minutes).

A rape shield hearing is neither a routine administrative matter nor is it "trivial" to the trial.  On the contrary, a rape shield hearing has a far closer kinship to pretrial suppression hearings, to which the United States Supreme Court decided in Waller that the Sixth Amendment public trial right attaches, than to any of the routine administrative matters that courts have subsequently determined may be conducted in a closed court room.  Like a pretrial suppression hearing, the determination emerging from a rape shield hearing often will have a critical impact on the trial itself, particularly in cases that hinge on the issue of consent.  Additionally, the admissibility of evidence otherwise barred under the rape shield law hinges on a showing that the evidence fits into one of the exceptions to the statute, and that its "weight and relevancy . . . is sufficient to outweigh its prejudicial effect

to the victim."  G. L. c. 233, § 21B.  The outcome of a rape shield hearing, then, like that of a pretrial suppression hearing, "frequently depends on a resolution of factual matters."  Waller, 467 U.S. at 47.

Citing a decision of the United States Court of Appeals for the First Circuit in United States v. Vazquez-Botet, 532 F.3d 37, 51-52 (1st Cir. 2008), the Commonwealth contends that the rape shield hearing is "more akin to 'question-and-answer' offer of proof hearings . . . than to potentially dispositive suppression hearings to which the public trial right applies." In that decision, however, the United States Court of Appeals for the First Circuit expressly "le[ft] open the possibility that the public-trial right may apply to some offer-of-proof hearings," only "declin[ing] to recognize such a right on facts as uncompelling as these."  Id. at 52.  In concluding that the public trial right did not attach to the particular offer of proof hearing at issue in that case, moreover, the court emphasized that the hearing "differed in at least two fundamental respects from the categories of non-trial hearings to which the Sixth Amendment public-trial right has been held to apply in the past . . . .  First, the evidence elicited at the hearing had already . . . been ruled irrelevant. . . . Second, the district court was under no obligation to hold the hearing in the first place, but chose to do so for our and the

defendants' benefit . . . ." Id.

Here, by contrast, the judge did not hold the rape shield
hearing solely "in order to create a record" of a relevancy
decision that it had already made for appellate review. Id. at
45. On the contrary, it was only after the rape shield hearing,
and on the basis of the testimony presented and the arguments
offered by the attorneys at that hearing, that the judge here
made his decision regarding the admissibility of the evidence of
the victim's prior sexual conduct. Furthermore, the judge had
no choice whether to hold the hearing. Rather, the judge was
obligated, under the rape shield statute, to hold the hearing
before reaching a decision on the admissibility of evidence
purportedly barred by the statute.

In determining that the public trial right attaches to a
rape shield hearing, we acknowledge that courts of other States
have reached differing conclusions. On the one hand, the
Connecticut Supreme Court has held that a trial judge erred in
justifying the closure of the court room for a rape shield
hearing on the basis of a "general reference to the rape shield
statute," as also occurred here. State v. Kelly, 208 Conn. 365,
374 (1988). Instead, the court held that, before closing the
court room, the trial judge should have made the case-specific
"findings as required by Waller." Id. See Kelly v. Meachum,
950 F. Supp. 461, 468 (D. Conn. 1996) (on collateral challenge

to defendant's conviction, "concur[ring] with the [Connecticut] Supreme Court's finding that the trial court improperly closed the courtroom at the petitioner's trial in that the trial court failed to make any findings adequate to support the closure," but rejecting Connecticut Supreme Court's requirement that petitioner prove prejudice to obtain relief for Sixth Amendment violation).

On the other hand, courts in Oregon and North Carolina have rejected public trial challenges to statutes mandating the closure of court rooms during rape shield hearings. See State v. McNeil, 99 N.C. App. 235, 242 (1990); State v. MacBale, 353 Or. 789, 813-815 (2013); State v. Blake, 53 Or. App. 906, 909-920 (1981). The crux of the reasoning in these decisions is that, because a "rape shield" hearing "is a preliminary one and is conducted only to exclude from the trial that which is irrelevant to the proceeding," and because "[u]nder the rules of evidence, that which is irrelevant should not be heard at all," the closure of the court room for the hearing does not violate the defendant's Sixth Amendment right to a public trial. State v. Blake, supra at 919. See State v. MacBale, supra at 814; State v. McNeil, supra.

We are not persuaded by the analysis in these decisions. First, evidence barred under the rape shield statute does not necessarily fail to meet the "minimal standard" of

"[r]elevancy." State v. Blake, 53 Or. App. at 919. On the contrary, Massachusetts's rape shield statute precludes the admission of evidence concerning a victim's past sexual conduct unless the evidence fits within the exceptions to the statute and the judge finds "that the weight and relevancy of said evidence is sufficient to outweigh its prejudicial effect to the victim." G. L. c. 233, § 21B. The statute, then, contemplates situations in which evidence is relevant, but its relevance is outweighed by its prejudicial effect to the victim. Second, the rape shield hearing may result in a finding that the weight and relevancy of the evidence does outweigh its prejudicial effect, and that the evidence consequently may be presented at trial. In Waller, 467 U.S. at 43, the United States Supreme Court observed that, following the petitioners' trial, "the transcript of the suppression hearing was released to the public," yet the public release of the transcript had no impact on the Court's determination that the closure of the court room during the hearing violated the petitioners' right to a public trial. Similarly, the fact that a defendant "will ultimately have the use of all . . . evidence" deemed relevant at the rape shield hearing has no bearing on the constitutionality of the court room closure during the hearing. State v. Blake, 53 Or. App. at 919. The subsequent presentation of certain evidence at trial cannot "cure" the problem resulting from the mandatory closure

rule any more than the subsequent release of a pretrial suppression hearing transcript could "cure" the closure of the hearing.  The notion that the ultimate presentation of evidence at trial somehow may retroactively remedy the closure of the hearing is particularly misguided because it was the improperly closed hearing itself that determined the scope of the evidence that could be presented at trial.

Finally, we discern no support for the assumption that the public trial right attaches only to proceedings at which relevant evidence is presented.  On the contrary, the United States Supreme Court has made clear that the public right "extends beyond the actual proof at trial."  Waller, 467 U.S. at 44.  The right, for instance, encompasses the pretrial jury selection process, Presley v. Georgia, 558 U.S. at 213; opening statements by counsel, Commonwealth v. Patry, 48 Mass. App. Ct. 470, 474 (2000); instructions to the jury, id.; the return of the verdict, id.; and posttrial sentencing proceedings, United States v. Rivera, 682 F.3d at 1228.  At none of these proceedings is relevant evidence presented, yet the public trial right attaches to all of them because of the values that the right serves.  As the United States Supreme Court has explained, "the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. . . .  [I]n the broadest terms,

public access to criminal trials permits the public to participate in and serve as a check upon the judicial process -- an essential component in our structure of self-government." Globe Newspaper Co., 457 U.S. at 606.

Courts that have determined that the public trial right does not attach to a rape shield proceeding have further observed that "a rape victim who is examined about the details of her personal sexual background may be less likely to be forthcoming if forced to discuss the matter in open court." State v. MacBale, 353 Or. at 814. See State v. Blake, 53 Or. App. at 920. That analysis confuses the threshold inquiry into whether the public trial right attaches to a rape shield hearing at all with the ultimate validity of a decision to close the court room during the hearing. The "public trial guarantee" is "one created for the benefit of the defendant," Gannett Co. v. DePasquale, 443 U.S. 368, 380 (1979); it is built on the premise that "[t]he knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power." In re Oliver, 333 U.S. 257, 270 (1948). In light of the important role that the public trial guarantee provides in protecting the rights of criminal defendants, we decline to conclude that a crucial hearing, whose outcome has a significant impact on a prosecution, falls outside of the public trial right altogether.

That conclusion does not mean, however, that we cannot consider other interests, including the interest in guarding against "harassment and further humiliation of the victim" (citation omitted). Commonwealth v. Joyce, 382 Mass. at 228. As noted, the public trial right is not absolute, but may give way in the face of "an overriding interest." Waller, 467 U.S. at 48. Accordingly, the judge is free to consider, among other things, the complainant's privacy interests and the potential impact that the public disclosure of intimate details concerning a rape victim's sexual history may have on a complainant's willingness to come forward.

Indeed, this court and others have upheld court room closures in a variety of contexts where trial judges complied with these constitutional requirements. In Commonwealth v. Caldwell, 459 Mass. 271, 283-284 (2011), for instance, we concluded that the trial judge, after making the findings required by Waller, properly excluded from the court room spectators who threatened a court officer with bodily harm. Other courts have concluded that a trial judge, again after making the findings required by Waller, properly closed the court room during an undercover police officer's testimony during a drug trial. See, e.g., Brown v. Kuhlmann, 142 F.3d 529, 537-539 (2d Cir. 1998); People v. Jones, 96 N.Y.2d 213, 220 (2001). Similarly, this court has found that, generally, "the

judge's verification of the validity of" an assertion of the privilege against self-incrimination must "be based on information provided in open court."  Pixley v. Commonwealth, 453 Mass. 827, 833 (2009).  A judge may hold an in camera hearing (called a "Martin hearing," see Commonwealth v. Martin, 423 Mass. 496 [1996]) on the validity of an assertion of the right against self-incrimination only after holding an open hearing at which the parties are "invite[d] . . . to provide the court with information that may shed light on whether the witness's testimony . . . could possibly tend to incriminate him."  Pixley v. Commonwealth, supra.  "Only in those rare circumstances where this information is inadequate to allow the judge to make an informed determination should the judge conduct an in camera Martin hearing with the witness to verify the claim of privilege."  Id. ("a Martin hearing should be conducted only as an exception to the general rule that the judge's verification of the validity of the privilege be based on information provided in open court").  See Commonwealth v. Sanders, 451 Mass. 290, 295-296 (2008).

Our conclusion that the public trial right attaches to rape shield hearings, therefore, does not mean that such hearings must be open to the public.  It does not contemplate a major change in the practice of court room closures during rape shield hearings; the State's overriding interest in protecting the

privacy rights of rape victims and the absence of any other more narrowly tailored means of accommodating that interest may well mean that the majority of rape shield proceedings properly are closed. Our conclusion simply means that, in view of the importance of the public trial right, before the court room properly may be closed during a rape shield procedure, the trial judge must conduct an individualized analysis consistent with the constitutional requirements set forth in Waller, supra.

The United States Supreme Court's decision in Globe Newspaper Co., 457 U.S. at 598, is instructive. That case concerned a statute that required the closure of a court room during the testimony of child victims of sexual assault. The Commonwealth contended that the statute sought to protect "minor victims of sex crimes from further trauma and embarrassment." Id. at 607. The Court agreed that the Commonwealth's asserted interest was "a compelling one." Id. The Court concluded, however, that, "as compelling as that interest is, it does not justify a mandatory closure rule," noting that "[a] trial court can determine on a case-by-case basis whether closure is necessary to protect the welfare of a minor victim." Id. at 607-608. The Court further concluded that, because the statute "requires closure even if the victim does not seek the exclusion of the press and general public," and because the statute did not take into account whether "the names of the minor victims

were already in the public record" or whether the victims would "have been willing to testify despite the presence of the press," the statute could not "be viewed as a narrowly tailored means of accommodating the State's asserted interest." Id. at 608-609. See G. L. c. 278, § 16D (b) (1) (requiring judicial determination before child witness's testimony may be offered in closed court room).

The same reasoning applies to the rape shield law. The public undoubtedly does have a compelling interest in protecting the privacy rights of rape victims and guarding against retraumatization through the public disclosure of intimate details regarding their past sexual conduct. Like the similarly compelling interest in protecting minor victims of sexual abuse, however, the interest in protecting rape victims does not require a mandatory closure rule, which commands that the proceeding be conducted in camera regardless of the wishes of the victim or any other factors that might argue against closure. In sum, the mandatory closure rule cannot be regarded as narrowly tailored to the State's compelling interest in protecting rape victims against retraumatization and smear tactics, because that interest could be served equally well by a case-by-case assessment, in accordance with the constitutional framework articulated in Waller. On remand for a new trial, therefore, the trial judge may close the rape shield hearing

only after making the findings as required by Waller.

Finally, we make a few remarks to clarify the implications of our determination regarding the public trial issue for other cases. Here, we are ordering a new trial on the basis of the impermissible admission of the first expert's testimony concerning how the swabs she tested were collected. Because the trial must be conducted anew, so must the rape shield hearing, if the defendant again seeks to offer evidence of the complainant's prior sexual interactions with the first complaint witness. In doing so, the judge must conduct the individualized analysis required by Waller before ordering a court room closure. While a violation of the public trial right is a structural error, the failure to comply with the Waller requirements before ordering a court room closure does not, standing alone, require a new trial. Waller, 467 U.S. at 49-50. See Commonwealth v. Cohen (No. 1), 456 Mass. 94, 118-119 (2010). Rather, in Waller itself, the United States Supreme Court, after concluding that the suppression hearing was closed improperly, held that "the remedy should be appropriate to the violation." Waller, 467 U.S. at 50. Consequently, the Court required only a new suppression hearing, observing that, "[i]f, after a new suppression hearing, essentially the same evidence is suppressed, a new trial presumably would be a windfall for the defendant, and not in the public interest." Id. Based on the

Waller Court's observations, various courts have concluded that, where a court room closure could have been justified, but the judge failed to comply with the requirement for individualized findings under Waller, the proper course is "to remand the case . . . for a hearing to reconstruct the circumstances that existed at the time of the trial and to determine whether the application to close the courtroom was well justified." Gonzalez v. Quinones, 211 F.3d 735, 738 (2d Cir. 2000). See United States v. Galloway, 937 F.2d 542, 547 (10th Cir. 1991); State v. Weber, 137 N.H. 193, 197 (1993).

We believe that the same approach is appropriate where a trial judge improperly closed a rape shield hearing without making the case-specific findings required in Waller. In such cases, assuming the objection to the closure of the hearing was properly preserved, and the case is still on direct appeal, the proper remedy will be to remand to the trial judge to determine whether the circumstances that existed at the time of the trial would have warranted the closure of the court room for the rape shield hearing. Even if the judge concludes that the circumstances did not warrant the closure of the hearing, the result will not necessarily be a new trial. Rather, the judge should then conduct the rape shield hearing anew. If the new rape shield hearing results in a determination regarding the admissibility of evidence of prior sexual conduct by the victim

that is "essentially the same" as the determination that emerged from the original hearing, then no new trial is required.  See Waller, 467 U.S. at 50.  A new trial will be necessary as a result of our holding, therefore, only if the circumstances that existed at the time of the trial did not justify the court room closure during the rape shield hearing, and only if the judge's decision in the wake of the new rape shield hearing is not "essentially the same" as the decision that emerged from the original rape shield hearing.

c.  Remaining arguments.  The defendant offers two additional arguments.  Because we have granted a new trial on the basis of the expert's improper testimony, we address these issues only briefly.

First, the defendant argues that his rights to a fair trial, to confront witnesses against him, and to present a defense were violated by the judge's decision to prohibit defense counsel from questioning either the victim or Tim about their prior sexual contact.  Because this decision was based on the testimony and argument presented at the closed rape shield hearing, and our remand may result in a new rape shield hearing, we do not address the defendant's argument at this time.

Second, the defendant argues that the judge erred in instructing the jury regarding the impact of the defendant's voluntary intoxication on whether he "reasonably should have

known" of the victim's capacity to consent. In response to a jury question regarding the meaning of "reasonably should have known," the judge indicated that the phrase denotes "an objective rather than subjective standard" that "requires you to consider all of the believable evidence in determining whether . . . an ordinary, prudent person would have considered the complainant too impaired to give consent." In its brief, the Commonwealth acknowledges that the jury instruction was inconsistent with this court's subsequent decision in Commonwealth v. Mountry, 463 Mass. at 92, where we held that the "element of knowledge is not purely objective," and that the Commonwealth must "prove what the defendant reasonably should have known, not what the average reasonable unintoxicated person would have known" (quotation omitted). Because that case was decided after the defendant's trial, however, and because the new standard it articulates is a common-law rule and is not constitutionally compelled, the Commonwealth argues that it should be applied only prospectively. Since we are remanding for a new trial, we need not address this question. At the defendant's new trial, the judge should instruct the jury in accordance with the new standard articulated in Commonwealth v. Mountry, supra.

3. Conclusion. The defendant's convictions are vacated and set aside. The matter is remanded to the Superior Court for

a new trial and for other proceedings consistent with this opinion.

<u>So ordered</u>.

GANTS, C.J. (concurring, with whom Spina, J., joins). I agree with the court that making a determination in accordance with Waller v. Georgia, 467 U.S. 39, 48-50 (1984), is constitutionally required before closing a court room to conduct a rape shield hearing under G. L. c. 233, § 21B. Ante at     . I also recognize that, because § 21B requires the hearing to be conducted "in camera," the public has been excluded from the court room without a Waller determination for most, if not all, rape shield hearings conducted prior to the issuance of this opinion. Consequently, some may fear that this opinion will generate a plethora of motions for a new trial claiming structural error as a result of the violation of the public trial right. I write separately to provide some perspective.

A motion for new trial (or a claim on direct appeal) based on the absence of a Waller determination will almost certainly be futile unless, as in this case, the defendant objected to the closing of the court room at the time of the rape shield hearing. Ante at     . I doubt that many defendants timely made such an objection. Without doing so, a defendant will be deemed to have waived his or her claim of error regarding the closure of the court room for such a hearing, and may only claim that defense counsel was ineffective for having failed to object. See Commonwealth v. Morganti, 467 Mass. 96, 102-103, cert. denied, 135 S. Ct. 356 (2014) ("the right to a public trial may

be procedurally waived by a failure to lodge a timely objection to the offending error," and if waived, "we still may have occasion to review that error in the postconviction context of a challenge to trial counsel's effectiveness in failing to raise the objection").  To prevail, a claim of ineffective assistance of counsel would require a finding that a substantial risk of a miscarriage of justice arose from the absence of such an objection, and under these circumstances it is difficult to imagine a case where such a finding would be warranted.  See Commonwealth v. LaChance, 469 Mass. 854, 857-858 (2014).

In the rare case where a defendant has preserved his or her claim of error by objecting to the closure of the court room during a rape shield hearing, the remedy the court provides is a remand for a posttrial Waller hearing, where the trial judge (or another judge, if the trial judge is no longer on the bench) will determine whether the closure of the court room would have satisfied the constitutional requirements of Waller had the judge made a Waller determination at the time of trial.  Ante at   .  The court states in its opinion that "the State's overriding interest in protecting the privacy rights of rape victims and the absence of any other more narrowly tailored means of accommodating that interest may well mean that the majority of rape shield proceedings properly are closed."  Ante at   .  Thus, I expect that few, if any, posttrial Waller

hearings will lead to a finding that the court room would not have been closed had the judge made a <u>Waller</u> determination at the time of trial.

Where there is such a finding, the court makes clear that the remedy is a new rape shield hearing with an open court room, not a new trial. <u>Ante</u> at    .  A new trial will be required only if the judge determines at the new rape shield hearing that significant evidence of prior sexual conduct by the victim, which was found inadmissible at the earlier rape shield hearing, would be admissible at a new trial.  <u>Id</u>.  I can understand why a judge, upon revisiting a rape shield issue, may come to a different conclusion regarding the admissibility of evidence of the victim's prior sexual conduct, but it is hard to imagine that this determination would be materially affected by whether the court room was open or closed.

Consequently, I foresee that very few, if any, defendants will receive a new trial as a result of this opinion.  As with <u>Waller</u>, the opinion here is not limited to prospective application, but its practical impact will be.