J-A20013-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
JERRY A. SMITH, II :
:
Appellant : No. 554 EDA 2022

Appeal from the Judgment of Sentence Entered January 18, 2022
In the Court of Common Pleas of Bucks County Criminal Division at
No(s): CP-09-CR-0005539-2019

BEFORE: BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.: **FILED OCTOBER 11, 2022**

Appellant, Jerry A. Smith, II, appeals from the aggregate judgment of

sentence of 6 to 12 months' incarceration, plus a concurrent term of 48

months' probation, imposed after a jury convicted him of terroristic threats

and harassment. On appeal, Appellant challenges the sufficiency of the

evidence to sustain his terroristic threats conviction, as well as the trial court's

admission of certain testimony by the victim in this case. After careful review,

we affirm.

The trial court summarized the facts and procedural history of

Appellant's case, as follows:

> The incident underlying Appellant's convictions occurred on
> October 13, 2018. Appellant and Alexandra Greenwood
> (hereinafter[,] "Victim") were driving home from a casino in
> Delaware when an argument escalated into Appellant['s]

_____

[*] Retired Senior Judge assigned to the Superior Court.

threatening to kill Victim. N.T.[,] 9/1/2021, [at] 21. They had been arguing for most of the day, starting during their drive from their apartment in Croyden, Bucks County, Pennsylvania, to the casino in Delaware, continuing at the casino, and ending on their drive home, back to their apartment. *Id.* at [] 17-20. Essentially, Appellant became upset when he suspected Victim misplaced $20 that he had given to Victim. *Id.* at [] 18.

After leaving Victim at the casino for several hours, Appellant returned to drive her home. *Id.* at [] 19. During the car ride, Appellant berated Victim as she remained silent in an attempt to de-escalate the situation. *Id.* As Appellant approached the exit on Interstate 95 in Bensalem, Bucks County, his rage peaked and he began to threaten Victim's life. *Id.* at [] 21. Victim testified that Appellant screamed[,] "I'm going to F'n kill you. I'm going to have you watch me kill your F'n brothers. You can call whoever you want. I'm gonna make you watch and then I'm going to F'n kill you" and that Appellant looked "…flushed in the face. His eyes [were] very piercing. His face was really scrunched up, and he was doing a lot of shaking like holding the steering wheel…[. Y]ou couldn't talk to him." *Id.* at [] 21-22.

Appellant then raised his hand in an opened-palm position above his head in an attempt to strike Victim. *Id.* at [] 26. He was able to grab her shirt and forcibly yank her. *Id.* Trapped in Appellant's car, Victim had no way to escape his rage, so she tried to call her cousin, Andre Francis (hereinafter "Mr. Francis"), for help. *Id.* at [] 22. Mr. Francis lived near Appellant and Victim's apartment and Victim hoped to have Mr. Francis meet them there to protect Victim when they arrived. *Id.* at [] 24. While Victim was on the phone, Appellant continued to threaten Victim's life and grabbed the phone from her hand. *Id.* at [] 25, 47, 51.

Appellant then came to a stop at a redlight right around the corner from their apartment. Victim took the opportunity to escape and ran to the vehicle behind her to beg for help and scream that Appellant was trying to kill her. *Id.* at [] 27. After the driver, Anthony Colacicco (hereinafter "Mr. Colacicco"), let Victim into his vehicle, Appellant pulled his car onto the side of the road and approached Mr. Colacicco's passenger window. *Id.* at [] 28. Appellant yelled at Victim to get out of the car and threatened to "f up" both Victim and Mr. Colacicco. *Id.*

Meanwhile, Victim begged Mr. Colacicco to leave and drive her to her mother's house in New Jersey because she feared going to her

and Appellant's apartment. ***Id.*** at [] 29. Mr. Colacicco obliged, and when she arrived at her mother's home, Victim immediately called police. ***Id.*** at [] 30. However, she was told to contact the Bensalem Police Department as that was where the incident occurred, and she did so the following morning. ***Id.***

On July 10, 2019, Appellant was charged with multiple offenses in connection with the confrontation. Defense counsel filed two pre-trial motions (Motion to Dismiss for Lack of Jurisdiction and Motion for Change of Venue), which were denied by this [c]ourt on August 31, 2021. Subsequently, after a trial by jury, on September 1, 2021, Appellant was found guilty of Terroristic Threats With Intent to Terrorize Another (M1)[1] and Harassment (M3).[2] Sentencing was deferred so Appellant could collect and present mitigating evidence.

   [1] 18 Pa.C.S. § 2706[(a)(1).]

   [2] 18 Pa.C.S. § 2709[(a)(4).]

On January 18, 2022, this [c]ourt sentenced Appellant to [6] … to [12] months in the Bucks County Correctional Facility (hereinafter "BCCF") and to a concurrent term of [48] months on county probation. This [c]ourt also [o]rdered Appellant to have no contact with Victim, to continue with drug and alcohol treatment, and to pay court costs. Appellant was given credit for time served from August 8, 2019[,] to January 11, 2021, and was therefore immediately released as he had maxed out the sentence [of incarceration that] this [c]ourt imposed…. On February 17, 2022, Appellant filed a Notice of Appeal to the Superior Court.

Trial Court Opinion (TCO), 4/5/22, at 1-3.

The trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and Appellant timely complied. The court filed its Rule 1925(a) opinion on April 5, 2022. Herein, Appellant states two issues for our review:

   A. Was the verdict of guilty of terroristic threats supported by sufficient evidence?

   B. Did the trial court err in permitting testimony regarding the effects of Appellant's statements on … [V]ictim?

- 3 -

J-A20013-22

Appellant's Brief at 7.

Appellant first challenges the sufficiency of the evidence to sustain his conviction for terroristic threats. To begin, we note that,

> [i]n reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. ***Commonwealth v. Moreno***, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. ***Commonwealth v. Hartzell***, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. ***Moreno, supra*** at 136.

***Commonwealth v. Koch***, 39 A.3d 996, 1001 (Pa. Super. 2011).

The crime of terroristic threats is defined, as follows:

> **(a) Offense defined.--**A person commits the crime of terroristic threats if the person communicates, either directly or indirectly, a threat to:
>
> > (1) commit any crime of violence with intent to terrorize another[.]

18 Pa.C.S. § 2706(a)(1).

Here, Appellant argues that the Commonwealth failed to prove that he acted with the intent to terrorize Victim. According to Appellant,

> [t]he courts of this Commonwealth have repeatedly held that threats made in anger are not sufficient to support a conviction for terroristic threats. Specifically, the courts have held for decades that individuals who make statements out of transitory anger do not possess the requisite intent to terrorize [that is] required by the terroristic threats statute.

Appellant's Brief at 9.

- 4 -

Appellant relies on three cases to support his position. First, in

**Commonwealth v. Anneski**, 525 A.2d 373 (Pa. Super. 1987),

> [t]he evidence disclosed … that [Anneski] spoke in anger, during a heated argument, because she believed that her child had been struck by [the victim's] automobile, and because she feared for the future safety of her children. Her threat was prompted by the belief that [the victim] would run into her children in the future. It contained the promise that if such should occur, [Anneski] would get a gun and use it. In summary, it appears that there was an exchange of threats made during a heated, perhaps hysterical, argument between neighbors.

**Id.** at 376. We found this evidence insufficient to prove Anneski intended to terrorize another, as she made "a spur-of-the-moment threat" resulting from transitory anger prompted by the victim's threat to hit Anneski's children with her car. **Id.** We reasoned that "[s]uch a response, even if not dignified or noble, was not the type of conduct made criminal by 18 Pa.C.S. § 2706." **Id.**

Second, Appellant cites **Commonwealth v. Kidd**, 442 A.2d 826 (Pa. Super. 1982). There, Kidd was arrested for public drunkenness and "repeatedly shouted obscenities and generally screamed and shouted at the officers[,]" telling "the police he was going to kill them, [and] machine gun them, if given a chance." **Id.** at 827. During Kidd's outburst, he was intoxicated, handcuffed, and in a hospital's emergency room receiving treatment for an injury he sustained while being transported to jail after his arrest. **Id.** On appeal, we reversed Kidd's convictions for terroristic threats. We reasoned that he "was obviously inebriated and in an agitated and angry state of mind." **Id.** We further observed that "the record evinces that his conduct expressed transitory anger rather than a settled purpose to carry out

the threat or to terrorize the other person." *Id.* Thus, we concluded that Kidd's "acts did not involve the sort of conduct that the Legislature intended to deter and punish by promulgation of section 2706 of the Crimes Code." *Id.*

Third, Appellant relies on *In the Interest of J.H.*, 797 A.2d 260 (Pa. Super. 2002). There, a teacher was disciplining J.H. for using profanity. *Id.* at 261. While J.H., who was on probation at the time, initially calmed down and apologized, he ultimately used profanity again. *Id.* When the teacher threatened to speak to J.H.'s probation officer, J.H. said, "it would be the last thing [she] ever did." *Id.* The teacher asked if J.H. "was aware that he was threatening her," at which point J.H. said "that he was 'promising [her].'" *Id.* J.H. was adjudicated delinquent of terroristic threats and, on appeal, we rejected his argument that his statement to the teacher "was not made with the requisite intent to terrorize because it was spontaneous, made in anger, and was the result of several psycho-social stressors he was experiencing at the time." *Id.* at 262.

Initially, we recognized our decisions in *Kidd* and *Anneski*, but clarified that "[b]eing angry does not render a person incapable of forming the intent to terrorize." *Id.* at 263 (citation omitted). Instead, we emphasized that "this Court must consider the totality of the circumstances to determine whether the threat was a result of a heated verbal exchange or confrontation." *Id.* We found that in J.H.'s case, it was not. We pointed to the fact that, "at the beginning of class on the day of the incident, J.H. was calm[,]" and after he was initially reprimanded, he "apologized and promised to stop using

profanity." *Id.* We also noted that, "[p]rior to the time J.H. threatened his teacher, there was no heated verbal exchange or confrontation between J.H. and his teacher. J.H.'s teacher simply was advising him of the consequences if he continued to use profanity in the classroom." *Id.*

Applying our holdings in *Kidd*, *Anneski*, and *J.H.* to the facts at hand, Appellant contends that "it is clear that the conviction for terroristic threats is not supported by sufficient evidence because the Commonwealth has failed to prove beyond a reasonable doubt that Appellant made the statements at issue with the intent to terrorize." Appellant's Brief at 12-13. He claims that,

> [o]n the contrary, the record supports a finding that the statements were made in the spur-of-the-moment out of anger. The testimony from the Commonwealth's witnesses is replete with descriptions of Appellant's angry state of mind. [Victim] testified that she was in a relationship with Appellant and that on October 13, 2018, they drove to Delaware. The two began arguing in the car on the way to a casino in Delaware and proceeded to argue all day. Appellant left [Victim] at the casino for a period of time[,] but the two continued to argue via text message. [Victim] described what happened when they met back up:
>
> > Q. When you met back up with [Appellant], did you continue to argue between the two of you?
> >
> > A. I didn't — I wasn't really arguing with him. He was still yelling, getting his anger out.
> >
> > Q. When you say he was yelling, can you just describe for us what that looked like?
> >
> > A. Just a lot of rage, a lot of anger, just yelling, screaming profanities, name calling.
>
> [Victim] further indicated that Appellant called her a liar and repeatedly told her that she never loved him. She described his physical state[, saying,] "He was flushed in the face. His eyes are very piercing. His face was really scrunched up, and he was doing

a lot of shaking like holding the steering wheel, shaking and getting -- you know -- he was just not -- you couldn't talk to him."

The Commonwealth also presented the testimony of [Victim's] cousin, Andre Francis. Mr. Francis testified that on October 18, 2019, [Victim] called him, and he could hear Appellant yelling in the background. He described Appellant's demeanor as follows:

Q. And when you heard his voice, what did it sound like at that moment?

A. Upset person, just, you know, an upset person, argument, you know, something going on and that's all I thought about it. That's all I could think of it. It was an argument and that was it.[]

Mr. Francis further described Appellant as angry and making threats out of anger.

The above testimony clearly describes a heated argument between paramours, not a terroristic threat. Appellant was obviously in a rage, shaking and screaming and telling [Victim] over and over that she never loved him. This does not establish that Appellant made statements with the intent to put [Victim] into a state of extreme fear. In fact, the opposite is true. It establishes that Appellant was extremely angry and that he made threats as a result of that anger. As in the numerous cases described above, there is insufficient evidence to prove that Appellant made these statements with the intent to terrorize.

*Id.* at 13-15 (citations to the record omitted).

In response, the Commonwealth insists that it proved the requisite

intent for terroristic threats. It explains:

These were not merely spur-of-the-moment threats, and the evidence at trial belies Appellant's assertion that his statements were purely the product of a dispute between paramours, or were made solely out of anger. To the contrary, Appellant communicated specific threats to kill … [V]ictim and members of her family should they come to her aid, and repeated those same threats throughout the car-ride home. The jury reasonably inferred that both his initial statements, as well as the subsequent statements, [were] legitimate threats of violence based on his demeanor, the statements' content, and the context in which

- 8 -

Appellant made them. … [V]ictim's terror was confirmed when Appellant attempted to strike her within the vehicle and when he threatened her cousin while she … attempted to contact him on the phone out of fear for her safety. Finally, Appellant's threats continued even after … [V]ictim escaped from his vehicle, at which point Appellant made the same threats against … [V]ictim and an innocent bystander who sought to extricate … [V]ictim from her precarious situation. Indeed, while Appellant insists that these statements were born out of an argument between himself and … [V]ictim, the totality of the evidence suggests that his threats were completely unprovoked, and that Appellant refused to relent despite … [V]ictim's silence in response.

Thus, Appellant communicated several distinct, unequivocal, and unprovoked threats to physically harm … [V]ictim, members of her family, and anyone else that would come to her aid. His intent to terrorize her was made clear by his specific references to … [V]ictim's family members and Mr. Colacicco, his refusal to abandon his pursuit of … [V]ictim when she escaped from his vehicle, and his unrelenting barrage of threats and insults for the entirety of the car-ride home. The logical implication of Appellant's statements and actions was that he intended to physically harm … [V]ictim and anyone that could come to her defense, and that his statements were made with the intent to terrorize her. Drawing all reasonable inferences in favor of the Commonwealth, the jury could reasonably conclude that Appellant intended to communicate crimes of violence with the intent to terrorize … [V]ictim.

Commonwealth's Brief at 8-10.

We agree with the Commonwealth that "Appellant's anger was anything but transitory," making this case distinguishable from *Anneski* and *Kidd*. Commonwealth's Brief at 11. On the contrary,

[V]ictim testified that [Appellant's] verbal abuse toward her lasted for an extended period during the car ride. Additionally, … Appellant identified members of … [V]ictim's family as targets of future physical violence and attempted to physically strike … Victim while she was in the vehicle. Appellant's attempt to follow through with his repeated threats of future violence made towards … [V]ictim demonstrates that his communications were specific

threats of immediate or future harm towards … [V]ictim, rather than spur-of-the-moment statements of transitory anger.

*Id.*

We also stress that Appellant and Victim's argument started on the way to the casino, after which the two separated for several hours. Despite this time away from Victim, Appellant picked her up later in the day and continued to verbally berate her. Victim testified that she did not respond when Appellant threatened her on the car ride home; instead, she remained silent in an attempt to de-escalate the situation. Nevertheless, Appellant threatened to kill Victim and her family members. Appellant then followed Victim when she fled from his car, again threatening her, as well as the innocent bystander attempting to help her. Appellant's conduct is not similar to the 'spur-of-the-moment' threats made in *Anneski* during a 'hysterical' confrontation between neighbors, or the threats made in *Kidd* while the appellant was drunk, enraged, and handcuffed. Instead, this case is more akin to *J.H.*, as Appellant had time to cool off and calm down when separated from Victim, yet he chose to continue berating and threatening her life, even as she remained silent and then fled from his vehicle. Therefore, we agree with the Commonwealth that the evidence proved that Appellant acted with the intent to terrorize Victim. No relief is due on his first issue.

Next, Appellant challenges the trial court's permitting Victim to testify, over Appellant's objection, "that she felt like Appellant was going to kill her." Appellant's Brief at 17. According to Appellant, "[t]his testimony was improperly admitted, and Appellant was prejudiced as a result. This evidence

- 10 -

was inflammatory, irrelevant, and had a high risk of misleading or confusing the jury and was admitted in error." *Id.*

Again, Appellant relies on *Anneski* to support his argument. There, the victim "was permitted to testify, over objection, that she had heard that appellant previously had shot at other persons." *Anneski*, 525 A.2d at 376. We concluded that "[t]his hearsay testimony was improper, not only because it was hearsay, but because it was irrelevant and highly prejudicial." *Id.* We explained:

> The offense of terroristic threats, as we have observed, was intended to impose criminal liability on persons who make threats which seriously impair another's personal security. It is the making of the threat with intent to terrorize that constitutes the crime. Neither the ability to carry out the threat nor a belief by the person threatened that it will be carried out is an essential element of the crime. Whether the complainant believed that [Anneski] had previously shot at another person, therefore, was irrelevant. Moreover, because the evidence suggested that [Anneski] had previously been involved in unrelated criminal activity, this evidence was highly prejudicial. **See[]** *Commonwealth v. Nichols*, … 400 A.2d 1281 ([Pa.] 1979); *Commonwealth v. Roman*, 351 A.2d 214 ([Pa.] 1976); *Commonwealth v. Shealey*, 471 A.2d 459 ([Pa. Super.] 1984).

*Id.*

According to Appellant, the at-issue testimony by Victim in this case mirrors the improperly admitted evidence in *Anneski*. He explains:

> [T]he fact that [Victim] believed Appellant was going to kill her was irrelevant. It is the making of the threat with the requisite intent which constitutes the crime. Whether the victim believes that the threat will be carried out is simply not an issue. This testimony is, therefore, of no probative value. Even assuming that it has any probative value, the probative value is far outweighed by the danger of unfair prejudice which resulted from

- 11 -

this testimony. The testimony was inflammatory and highly prejudicial. As such, the trial court erred in admitting this evidence and Appellant is entitled to a new trial.

Appellant's Brief at 18.

We disagree with Appellant. First, we recognize that,

[t]he standard of review employed when faced with a challenge to the trial court's decision as to whether or not to admit evidence is well settled. Questions concerning the admissibility of evidence lie within the sound discretion of the trial court, and a reviewing court will not reverse the trial court's decision absent a clear abuse of discretion. *Commonwealth v. Hunzer,* 868 A.2d 498 (Pa. Super. 2005). Abuse of discretion is not merely an error of judgment, but rather where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Id.*

*Commonwealth v. Young*, 989 A.2d 920, 924 (Pa. Super. 2010) (citation

omitted).

Moreover,

[r]elevance is the threshold for admissibility of evidence. Pennsylvania Rule of Evidence 401 provides as follows:

**Rule 401.**

**Test for Relevant Evidence**

Evidence is relevant if:

(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and

(b) the fact is of consequence in determining the action.

Pa.R.E. 401. Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible.

"The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

***Commonwealth v. Tyson***, 119 A.3d 353, 358 (Pa. Super. 2015) (some internal citations and quotation marks omitted).

Here, Victim's at-issue testimony was offered during the following portion of the Commonwealth's direct examination:

[The Commonwealth]: And why [did] you call your cousin?

[Victim:] He was the closest person to me.

[The Commonwealth:] And when you say closest, what do you mean by that?

[Victim:] Closest family member in the states.

[The Commonwealth:] So do you mean geographically and physically close to you?

[Victim:] Correct.

[The Commonwealth:] And why did you consider who was closest to you physically at that moment?

[Victim:] Because I felt like [Appellant] actually was going to kill me and I wanted someone to come.

N.T. at 22-23. After Appellant objected to the relevancy of Victim's testimony, the court stated:

[The Court]: Sure, but I don't want to say too much in front of the jury. I think the jury can figure that out and I will give them an instruction. They'll understand that. I will overrule the objection, but we're not going to go far with this. Another question or two[,] then let's move on from that.

*Id.* at 24. The Commonwealth then asked Victim if she would "finish [her] statement [as] to why … [she was] looking for someone that was closest to [her] at that time[,]" to which Victim replied:

> [Victim:] I was almost home and I knew my cousin would be able to get to me the fastest before we got home because that's where [Appellant] said he was going to kill me. So if my cousin got there fast enough then … he would not have killed me.

*Id.* The Commonwealth then moved on to a different line of questioning. Later, at the close of the jury instructions, the court asked if the parties wanted the court "to clarify anything or … add anything" to its instructions, and each party declined. *Id.* at 85.

From this record, we do not discern reversible error in the court's overruling Appellant's objection to Victim's testimony. First, unlike *Anneski*, Victim's testimony did not constitute hearsay. Second, the Commonwealth convincingly argues that, as "evident from the context of the Commonwealth's question and … [V]ictim's response[,] … this testimony was relevant … to establish why … [V]ictim chose to call her cousin during Appellant's verbal abuse of her in the car, and to lay the foundation for Mr. Francis'[s] future testimony regarding the contents of that telephone call." Commonwealth's Brief at 14-15. The Commonwealth further argues that, because Victim's "testimony was plainly relevant for this purpose and [was] otherwise admissible, the trial court would only have been entitled to exclude it if the danger of unfair prejudice outweighed its probative value." *Id.* at 15 (citing Pa.R.E. 403).

We do not find that any prejudice resulting from Victim's testimony outweighed its probative value in explaining why she called her cousin, which provided a foundation for her cousin's later testimony about what he heard during her phone call to him. In **Anneski**, the testimony that the victim had heard that Anneski previously had shot at other people was highly prejudicial because it involved allegations of prior criminal conduct by Anneski. Here, in contrast, Victim's testimony only regarded her **subjective belief** that Appellant would kill her. There was no indication that Victim's belief was premised on any prior crimes or bad acts by Appellant; instead, it was based solely on his threats and behavior during the present incident. Thus, Victim's testimony is not comparable to the evidence at issue in **Anneski**.

Moreover, as the trial court stresses, it "warned the Commonwealth not to go further into the matter and the Commonwealth obliged, only permitting Victim to finish her statement before moving on to the next line of questioning." TCO at 8-9 (citing N.T. at 24). More importantly, the court also "offered to provide an instruction to ensure that [Victim's testimony] would not be considered improperly." **Id.** at 8 (citing N.T. at 24). However, "after the jury instructions were given, [the court] asked both the Commonwealth and defense counsel if they wished to have th[e c]ourt clarify or add anything[,]" and "[b]oth parties declined as they were, presumably, satisfied with the jury instructions given." **Id.** at 8 n.3. Appellant's failure to request a charge to lessen the ostensibly prejudicial impact of Victim's at-issue testimony undercuts his present argument that the prejudice he suffered was

great enough to warrant a new trial. Accordingly, we conclude that the court's overruling Appellant's objection to Victim's testimony does not constitute reversible error.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/11/2022