351 A.2d 214

**COMMONWEALTH of Pennsylvania,
Appellee,**

v.

**Gary ROMAN, Appellant.**

Supreme Court of Pennsylvania.

Argued Sept. 23, 1975.

Decided Jan. 29, 1976.

516

518

John Edward Calior, Rodgers, Marks & Perfilio, Sharon, for appellant.

Robert F. Banks, Asst. Dist. Atty., Joseph J. Nelson, Dist. Atty., Mercer, for appellee.

Before EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

EAGEN, Justice.

The appellant, Gary Roman, was convicted by a jury of murder in the second degree.[1] Following the denial of a motion in arrest of judgment and a motion for a new trial, a prison sentence was imposed. This appeal followed.

The prosecution emanated from the killing of one Mark Chancellor on a farm located in a rural section of Mercer County on which John Gilkey, his wife Mary and their six children resided.

To connect Roman with Chancellor's killing, the Commonwealth relied mainly on the testimony of Mary Gilkey, which may be summarized in this manner.

Prior to and in October 1973, there existed in the Northeastern United States an organization known as "The Breed Motorcycle Gang" (The Breed), which included, among others in Ohio, one chapter in Masury, which is located across the state line from Sharon, Pennsylvania. John Gilkey was a member of The Breed and president of the Masury Chapter, but in October 1973, the membership of this chapter had dwindled to a few individuals and Gilkey was considering withdrawing from the organization.

On Saturday, October 7, 1973, Roman who was "Sergeant-at-Arms" of the Mother, or governing, Chapter in New Jersey and a William Zillgitt, a member of a New York Chapter, arrived at the Gilkey dwelling house with orders from those in charge of the Mother Chapter to save the Masury Chapter by "getting more new members into it" and also to dissuade Gilkey from withdrawing. Roman was armed with a .32 caliber revolver and Zillgitt

---

1. Roman was also tried on an indictment charging him with conspiracy to commit murder, but he was acquitted by the jury of this charge.

with a .25 automatic. Roman was also the operator of the lead motorcycle whenever members of The Breed ventured on the road for a shoot-out with a rival gang.

That evening the Gilkeys and a Frank Howell, who lived with them and was a member of The Breed, accompanied Roman, Zillgitt and a Tina Kendell to Capuzzi's Bar in Brookfield, Ohio. While there Roman engaged in an argument with one of the female patrons whom he had never seen before. Then, as this person started to walk to a phone booth, Roman pulled his revolver and "started shooting at her feet." Later, after departing the bar and during the return trip to the Gilkey farm in an automobile, Roman fired his revolver from an open window of the moving vehicle.

On Sunday, October 8, 1973, Roman, Zillgitt and Tina Kendell went back into Ohio and returned with a John Messer, a member of The Breed, who had not been attending the required meetings. When Messer arrived, Mary Gilkey, her children and Tina Kendell were told to leave the house because the club had some private business. Later, when Mrs. Gilkey returned she saw Messer's face was bloody, bruised and swollen. She also saw Messer being beaten by Roman, Gilkey, Zillgitt and Howell. She also saw Roman use his revolver to fire a series of bullets into the wall behind Messer, outlining his head, and into the floor near Messer's feet. Later she saw Messer being escorted from the Gilkey residence by Roman and his companion. He was taken to the residence of Donald Treftz, in Lyndon, Illinois, who was president of the consolidated Ohio Chapters.

On Friday, October 12, 1973, members of The Breed gathered at the Gilkey residence. Roman, Zillgitt, Howell and Gilkey were joined by members, Dave Byerly from Sharpsville, Gary Faust from Cleveland and a former member called "Tiny." Late in the afternoon Faust left the farm saying he was to meet some "prospects." He returned shortly thereafter with a Mark Chancellor and

two other males. Later that evening some of those present "went out after a cow" to feed the group, but returned empty-handed. Roman, Howell and Faust then departed on a similar mission and returned with two calves in tow. Roman hit one on the head with his fist, staggered it, and then killed it with a hammer. The meat was cooked by "Tiny."

On Saturday, October 13, 1973, the group was joined by Donald Treftz, who was president of the consolidated Ohio Chapters of The Breed, and all engaged in target practice. Roman fired his .32 caliber; Treftz, his .38 caliber; Zillgitt, his .25 automatic; and Gilkey, his shotgun.

That evening a meeting of the group was held in the kitchen of the Gilkey house attended by Roman and all of the other members of The Breed, heretofore mentioned, plus Chancellor and the other two "prospects." Mary Gilkey who was in an adjoining room heard Zillgitt say, "You'll never made a good Breed." She then heard a crash or "a heavy thud." Mary Gilkey went into the kitchen to retrieve her son who was now crying, but was told by Zillgitt to leave him be. She saw Roman standing adjacent to the kitchen table and several other men, including her husband, Zillgett, Howell, Faust and Treftz standing around in the kitchen. Chancellor was lying on the floor. She then returned to the adjoining room.

The child began to scream and Mary Gilkey again went into the kitchen to retrieve him. This time, she saw Chancellor was no longer in the kitchen, but she noticed a "hump" at the foot of the outside stairs leading to the back porch and "concluded" it was Chancellor. Zillgitt was standing on the rear porch and Treftz was in the doorway. Roman and the others were still in the kitchen. She then heard Zillgitt say, "You're the President of the Ohio Chapter, what are you going to do about it?" When she was leaving the kitchen, she heard Zillgitt say, "You're as good as dead." Shortly thereafter,

she heard a shot, then a volley of shots. Then she heard her husband say, "You better start digging a grave," and heard people leaving the kitchen through the door leading to the rear porch. Later Roman, Zillgitt and the others re-entered the house through the front door. All appeared wet and muddy, but Roman appeared less so than the others. When Mary Gilkey asked the whereabouts of Chancellor, she was told, after some hesitation, "he had hitch-hiked home."

Other testimony established that on October 26, 1973, officers of the Pennsylvania State Police, acting pursuant to an anonymous phone call, found Chancellor's dead body in a shallow grave about four hundred feet from the Gilkey farmhouse.

A medical pathologist testified to performing an autopsy on Chancellor's body on October 26, 1973, and finding evidence of three bullet wounds; a wound in the area of the collarbone caused by a sharp instrument which extended downward to the fourth dorsal vertebrae; plus bruises and lacerations on the left side of the face apparently caused by heavy blows. One bullet was recovered from the body which tests deomonstrated to have been fired from a .38 caliber gun. The physician opined that death was caused by one of the bullet wounds and occurred about ten days before the autopsy.

 Initially, Roman challenges the sufficiency of the evidence to sustain his conviction.[2] We are not so persuaded.

 Roman urges the trial evidence merely established his presence on the scene of the murder and that

2. The Commonwealth contends this issue has not been preserved for appellate review because it was not presented to the trial court in accordance with the Supreme Court Rules and was not mentioned during the argument on the post trial motions. However, the record discloses that a motion in arrest of judgment was timely filed, and overruled by the trial court on the merits. Under the circumstances, the issue is properly before us.

under *Commonwealth v. Fields*, 460 Pa. 316, 333 A.2d 745 (1975), this is not enough to establish he aided and abetted in the crime as the Commonwealth contends.[3] It is true that mere presence at the scene of a crime is not sufficient to prove participation, however, if one is an active partner in the intent to commit the crime and offers any advice or encouragement to induce its commission, he is an aider and abettor and, as such, is equally responsible criminally with the principal. *Commonwealth v. Leach*, 455 Pa. 448, 317 A.2d 293 (1974). See also New Crimes Code of December 6, 1972 (effective June 6, 1973) P.L. 1482, No. 334, § 1, 18 C.P.S.A. § 306. While the evidence of Roman's guilt was entirely circumstantial, we are completely satisfied it was of sufficient quality and quantity to permit a jury to find that he was at least "an active partner in the intent to commit" the murder and offered encouragement to induce its commission. Cf. *Commonwealth v. Smith*, 447 Pa. 457, 291 A.2d 103 (1972). See also *Commonwealth v. Frye*, 433 Pa. 473, 252 A.2d 580 (1969).

Roman's next contention is the trial court erred in admitting evidence of the incidents at Capuzzi's Bar, the beating of John Messer and the theft of two calves.[4]

As a general rule, evidence of a distinct crime, not charged in the indictment, cannot, except under special circumstances, be introduced against a defendant since the fact of commission of one crime is not proof of the commission of another and the evidence of a distinct crime is so prejudicial that it strips the defendant of the presumption of innocence. *Commonwealth v. Groce*, 452 Pa. 15, 303 A.2d 917 (1973); *Commonwealth v. Foose*, 441 Pa. 173, 272 A.2d 452 (1971); *Commonwealth v.*

3. In its brief, the Commonwealth argues the evidence was adequate to show Roman was "the motivating factor" and "a cohort, and accomplice of the man who did murder Chancellor."

4. This assignment of error has been properly preserved throughout for appellate review.

*Burdell*, 380 Pa. 43, 110 A.2d 193 (1955). One of the special circumstances, operating as an exception to the general rule, under which evidence of a distinct crime may be introduced against a defendant is that situation where the proffered testimony tends to establish defendant's motive for the killing charged in the indictment. *Commonwealth v. Schwartz*, 445 Pa. 515, 285 A.2d 154 (1971); *Commonwealth v. Coyle*, 415 Pa. 379, 203 A.2d 782 (1964); *Commonwealth v. Ferrigan*, 44 Pa. 386 (1863). However, to be admissible under the above exception, evidence of a distinct crime, even if relevant to motive, "must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Schwartz*, supra, 445 Pa. at 522, 285 A.2d at 158.

In the instant case, the Commonwealth's theory is that Roman, as enforcer from the governing chapter, used the objected to incidents to excite the other members into a frenzy and to impose his will and dedication to the organization on the other members. After producing a frenzy and imposing his will on the others, his continued presence was a cause of the death of the prospect Chancellor, who was reluctant to join. In effect, the Commonwealth's theory is that Roman calculated the shooting at Capuzzi's Bar, the beating of John Messer and the calf rustling to induce the other members to do whatever was necessary to preserve and further the interests of the club, including killing a non-conforming or reluctant member.[5]

In examining their admissibility, each incident will be considered separately.

---

[5] It has not been considered here if this theory, even if proved, would be sufficient to convict Roman of murder. Given the facts of this case, there are causation problems with the theory, as well as consideration, of whether the inciting here is legally recognizable in the law of homicide.

(A) The shooting at Capuzzi's Bar:

The first inquiry here is whether this incident tends to establish defendant's intent or motive to predispose the group to murder, if necessary. While the defendant's conduct at Capuzzi's Bar shows him to be prone to violence and, as such, capable of a murderous assault, there is very little here to show an intent or motive to predispose the group. To be relevant to the Commonwealth's theory, it would be necessary that some element of control or manipulation of the group was present in Roman's behavior at Capuzzi's Bar. On the contrary, this act appears to be unrelated not only to the Commonwealth's theory but also to the victim, Chancellor. What the incident shows is Roman's violent response to an argument with a stranger. It does not appear in the record, nor does an inference naturally arise, that Roman concocted, planned or used the incident to instruct the group on how to deal with persons who do not comport with club rules. Further, there appears little relationship between this incident and Chancellor's death. Roman did not know of Chancellor at this time nor is the incident useful to determine any plan that Roman may have had to deal with unacceptable prospects. This incident, in short, tends to establish Roman's violent nature without showing malice toward an unknown prospect, intent to reorganize the local chapter or motive to predispose the group to murder. Cf. *Commonwealth v. Williams*, 230 Pa.Super. 72, 327 A.2d 367 (1974). We fail to see any probative value here which would outweigh its obvious prejudicial character and, therefore, must conclude the trial court's admission of evidence of this incident was error.

(B) The beating of John (Bozo) Messer:

The beating of John Messer presents a more difficult problem. The Commonwealth argues that from the beating of a derelict member, an inference may arise

that Roman planned the incident to warn and instruct the group on how other derelict members or prospects would be handled. This inference would not only tend to support an element of the Commonwealth's theory but also display Roman's role as an enforcer. However, there must be some relationship between the beating of Messer and the death of Chancellor. According to the Commonwealth's theory, Chancellor's death grew out of this incident because the beating had a predisposing effect on the group to kill an unknown, reluctant, unacceptable prospect. However, the difficulty here is that the prosecution's theory of the killing in this case is all encompassing.[6] Therefore, the question of relevancy here is whether the inference is too indefinite or conjectural in its indications of Roman's plan or motive to have probative value. The record reveals that members who did not attend the meetings and functions of The Breed were subject to disciplinary action while a prospect, not a full member, was free to abandon his attempt to join without disciplinary reprisal. Therefore, it does not appear that an inference from Roman's behavior in the beating of a member could be directly applied to the death of a prospect.

The second element in the Commonwealth's argument for admission is that the beating of Messer shows Roman as the enforcer of the group. However, the Commonwealth has not established Roman to be an "enforcer" with the attendant connotations of that word. There is testimony that he was the Sergeant-at-Arms of the governing chapter but there has been no evidence that Roman instigated this incident or took any leadership role in Mercer County. Nor does this incident supply the

6. By all encompassing, it is meant that the Commonwealth assumes that all the activities of The Breed were progressing toward the murder of *someone or one person within a class* and that all and every event in that progression is independently relevant whether that event was directed toward a person or toward a member of a particular group.

jury with the concept that Roman was the leader of the gang or used this incident for later purposes. In fact, the beating was administered not only by Roman but also by Gilkey, president of the local chapter, Zillgitt from New York, and Howell. The Commonwealth leaves to conjecture whether Roman or one of the others, notably one with an office in the organization, instigated the beating. Further, after the beating, Messer was taken to Treftz, president of all Ohio chapters, an action that an enforcer would not be required to take. The inferences the Commonwealth advocates would be conjectural. See *Commonwealth v. Schwartz,* supra. The evidence fails to prove what it was offered to prove and it was error to admit it.

(C) The stealing and slaughtering of two calves:

■ This incident appears to be totally unrelated to either Roman's position as an enforcer or to any plan to predispose the group to murder. The incident shows Roman stealing two calves and punching one of the animals barehanded. The proffered testimony does not show Roman as an enforcer nor is it probative of any motive or plan to predispose the club. Further, no direct connection can be drawn between calf rustling and the death of Chancellor. Cf. *Commonwealth v. Raymond,* 412 Pa. 194, 194 A.2d 150 (1963) ; *Commonwealth v. Burdell,* 380 Pa. 43, 110 A.2d 193 (1955). Testimony of this incident serves only to paint Roman as a disreputable character not to establish an element of the prosecution's theory.

It should also be noted that the trial court's opinion disposing of the post trial motions presents no basis for admitting the testimony. The trial court relies heavily on cases which deal with organizations banded together to commit crimes: The Molly Maquires, *Carroll v. Commonwealth,* 84 Pa. 107 (1877) ; *Campbell v. Commonwealth,* 84 Pa. 187 (1877) ; Black Hand, *Commonwealth v. Fragassa,* 278 Pa. 1, 122 A. 88 (1923); Mafia, *Com-*

*monwealth v. Campolla,* 28 Pa.Super. 379 (1905). However, other than testimony that members of The Breed would fight, using weapons, with members of other motorcycle gangs, there is nothing in the record to indicate that a purpose of The Breed's existence is to commit crimes.

Finally, in his offer of proof, the district attorney offered the challenged testimony to show "the attitude, you know, of the individual, what they are working up to." To which the trial judge responded, "It shows the propensity for violence. We overrule the objection." Therefore, at that time, the testimony was admitted for an improper purpose. The subsequent explanations by both the district attorney and the trial judge are, in this light, mere justifications.

In view of this evidence's prejudicial nature and its dubious relevancy, error was committed when testimony regarding these incidents was admitted. *Commonwealth v. Groce,* supra; *Commonwealth v. Foose,* supra.

■ Regardless of Roman's personal character, he was entitled to have the jury determine his guilt or innocence of the crime charged in an objective manner. It is obvious to us that the erroneous admission of the evidence of the incidents unrelated to the crime on trial prevented such a determination. A new trial is, therefore, mandated.

Judgment reversed and a new trial ordered.

JONES, C. J., took no part in the consideration or decision of this case.