**[J-8A-2025, J-8B-2025 and J-8C-2025] [MO:McCaffery, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 38 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 788 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006112-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 39 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 790 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006114-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 40 EAP 2024 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court at No. 789 EDA |
| | : | 2022 entered on November 30, |
| v. | : | 2023, affirming the Judgment of |
| | : | Sentence of the Philadelphia County |
| | : | Court of Common Pleas at No. CP- |
| DERRICK WALKER, | : | 51-CR-0006113-2019 entered on |
| | : | March 1, 2022. |
| Appellant | : | |
| | : | ARGUED: March 5, 2025 |

# CONCURRING AND DISSENTING OPINION

**JUSTICE DOUGHERTY**                               **DECIDED: January 28, 2026**

I agree with the majority[1] "the time has come for this Court to acknowledge that the 'logical connection' test runs afoul of the purpose of Rule 404(b) and invites the admission of impermissible propensity evidence." Majority Opinion at 30. But, respectfully, the majority swings the pendulum too far the other way. I thus write separately to explain my interpretation of Rule 404(b)'s "plan" exception; outline my belief that an "unlinked plan" theory may satisfy Rule 404(b) in certain narrow cases; elaborate on why consolidation was error in this case even pursuant to an unlinked plan theory, but that the Commonwealth can pursue a different consolidation theory on remand; and express my view that the Court should not reach the second issue on which we granted review. I therefore join Parts I, II, III(A)-(B), and III(C)(iv) of the majority opinion, except footnote 19, and I join Part III(C)(i) to the extent it abrogates the logical connection test. Otherwise, I respectfully dissent.

As an initial matter, however, it is incumbent I explain my departure from *Commonwealth v. Hicks*, where I authored this Court's plurality opinion applying the logical connection test. *See* 156 A.3d 1114 (Pa. 2017).[2] As recounted by the majority, Hicks was sentenced to death for murder. Parts of the victim's body were found in

---

[1] As explained *infra*, only portions of the lead opinion have garnered a majority vote. But for ease of reference, I refer to that opinion as the "majority" or "Majority Opinion."

[2] In *Hicks*, we articulated the logical connection test as follows: "In order for other crimes evidence to be admissible, its probative value must outweigh its potential for unfair prejudice against the defendant, Pa.R.E. 404(b)(2), and a comparison of the crimes proffered must show a logical connection between them and the crime currently charged." 156 A.3d at 1125; *see also Commonwealth v. Miller*, 664 A.2d 1310, 1318 (Pa. 1995) ("In order for other crimes evidence to be admissible under th[e common plan, scheme, or design] exception, a comparison of the crimes must establish a logical connection between them.") (abrogated on other grounds).

multiple garbage bags in Monroe and Lackawanna Counties (except for her hands, which were found in the walls of Hicks's house). Relevantly, there was evidence the victim suffered injuries to her neck, face, and head, and a forensic pathologist who reviewed the autopsy report concluded her cause of death was a combination of strangulation and sharp force injury to her neck. *See id.* at 1117. During an interview with police, Hicks acknowledged he knew the victim as a prostitute and had been with her the same month her body parts were found. *See id.* at 1118.

At trial, the Commonwealth presented the testimony of three other women pursuant to Rule 404(b) and the common plan, scheme, or design exception. The women testified they engaged in prostitution and drug use with Hicks, and that he became violent, grabbing them by the neck and choking them; one also testified he held a knife to her throat while attempting to penetrate her sexually. *See id.* at 1221-22. On appeal, we affirmed in a fractured decision. Writing for the plurality, I reasoned the trial court did not abuse its discretion in admitting the Rule 404(b) evidence about Hicks's prior relationships with, and assaults upon, the three other women because "they were strikingly similar to the circumstances surrounding his relationship with the victim, her injuries, and her subsequent death, such that there was a logical connection between them." *Id.* at 1127. Additionally, I determined the similarities also presented a "virtual signature" for purposes of proving common scheme, intent, and identity, as "[t]hey [we]re not mere insignificant details of crimes of the same class, where there [wa]s nothing distinctive to separate them from, for example, common street crimes." *Id.* at 1128, *citing, inter alia, Commonwealth v. Arrington*, 86 A.3d 831, 844-45 (Pa. 2014) (evidence of past abusive relationships admissible in murder case where "[t]he testimony concerning [Arrington]'s treatment of other girlfriends demonstrated repeated efforts to preserve intimate relationships through harassment, intimidation, and physical violence culminating in the use of a deadly

weapon"); *Commonwealth v. Weakley*, 972 A.2d 1182, 1189 (Pa. Super. 2009) ("Sufficient commonality of factors between the two crimes here dispels the notion that they are merely coincidental and permits the contrary conclusion that they are so logically connected they share a perpetrator.").

Despite the flaws the majority has identified with the logical connection test, it was the applicable standard when the Court decided *Hicks* in 2017. Notably, the question presented in *Hicks* was simply: "Did the trial court abuse its discretion by wrongfully admitting testimony from three witnesses in regards to prejudicial 404(b) evidence enabling the Commonwealth and preventing the defendant from having a fair trial?" Appellant's Brief at 5, *Commonwealth v. Hicks*, 718 CAP. Hicks did not ask for a change in the law, nor did he even cite *Shaffner v. Commonwealth*, 72 Pa. 60 (Pa. 1872). Notwithstanding the salient points made by Justice Donohue in her *Hicks* dissent, it was not yet time to make the shift. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) ("In our adversarial system of adjudication, we follow the principle of party presentation. . . . [W]e rely on the parties to frame the issues for decision" while the court serves as "neutral arbiter of matters the parties present.") (internal quotations and citation omitted).

Today, it's a different story. The divided decision in *Hicks* injected uncertainty into the law concerning the common plan, scheme, or design exception. *See Commonwealth v. Gill*, 206 A.3d 459, 472 n.8 (Pa. 2019) (Wecht, J., concurring) (citing Justice Donohue's dissent and then-Chief Justice Saylor's concurrence in *Hicks* for the proposition that "[i]n recent years, the issue of whether courts of this Commonwealth actually impose what should be strict admissibility requirements upon the Commonwealth's use of Rule 404(b) evidence to prove a defendant's identity has begun to resonate on this Court"). Adding to the signs of fluctuation in this area of the law, the reasoning in Justice Donohue's *Hicks*

dissent made its way into a majority opinion, although this exact issue was not addressed. *See Commonwealth v. Yale*, 249 A.3d 1001, 1015 (Pa. 2021) ("To safeguard the boundaries between Rule 404(b)'s prohibition and its exceptions, this Court has consistently required that evidence of a defendant's bad acts submit to two principles derived from *Shaffner* and embedded in our decisional law: Bad act evidence is admissible 1) if a logical connection exists between the bad act(s) and the crime charged, linking them for a purpose the defendant intended to accomplish, or 2) if the bad acts manifest a signature crime."), *citing Hicks*, 156 A.3d at 1143 (Donohue, J., dissenting).

Unsurprisingly, this uncertainty led appellant to pointedly ask:

Where this Court has previously split on the issue, what test should be employed in determining when 'other act' evidence satisfies the 'common plan' exception under Pa.R.E. 404(b); and under any of the possible tests approved by this Court, did the lower courts err by applying such a diluted standard that they improperly admitted prohibited propensity evidence under the guise of 'common plan'?

*Commonwealth v. Walker*, 317 A.3d 524, 525 (Pa. 2024) (*per curiam*). Now that the question is squarely before us, and with the benefit of able briefing and my colleagues' thoughtful expressions on the matter, I am prepared to revisit the reasoning in *Hicks*. After all, "[w]isdom too often never comes, and so one ought not to reject it merely because it comes late." *Henslee v. Union Planters Nat'l Bank & Trust Co.*, 335 U.S. 595, 600 (1949) (Frankfurter, J., dissenting).

## I. Consolidation and Other Crimes Evidence Under Rule 404(b)

Getting to the merits, the majority does an excellent job tracing the conflation of the two exceptions recognized in *Shaffner*, which led to the modern articulations of the logical connection test. *See* Majority Opinion at 15-24. I further agree with the majority that the logical connection test "ignores the purpose of Rule 404(b) and allows for the admission of pure propensity evidence." *Id.* at 32. By requiring a mere logical connection between the crimes, extremely prejudicial other crimes evidence becomes admissible due

to base similarities, an overly lax standard that provides an easy pretext for the admission of propensity evidence. I therefore join the majority's holding to the extent it abrogates the logical connection test.

Unlike the majority, however, I do not foreclose the possibility that, in appropriate circumstances, an "unlinked plan" theory could serve as an exception to Rule 404(b)'s general rule of exclusion.[3] *Contra id.* at 33 ("In order to admit a defendant's other bad acts or crimes under this exception, the Commonwealth must demonstrate that those bad acts or crimes are linked to one common goal and are part of a plan to accomplish that goal.").

To start, although this case has focused on the judicially created "common plan, scheme, or design" exception, I find it more straightforward to focus on the language of Rule 404(b) itself. Indeed, I question the need for continued reference to the common law exception in the wake of the enactment of Rule 404(b), which expressly provides exceptions for evidence of "any other crime, wrong, or act" if it is used for a purpose other than propensity, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(1)-(2). Thus, I turn to the text of the Rule itself.

Most relevant here is the word "plan" in Rule 404(b)(2). By its plain meaning, the word "plan" involves some level of forethought for actions to be taken in the future. *See* Pa.R.J.A. 106(a) (in construing rules adopted by this Court, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage"). As expected, dictionary definitions support that ordinary meaning. *See id.*, Cmt.

---

[3] Unlike the "linked plan" theory delineated in *Shaffner* (where a connection between the crimes existed in the mind of the actor, linking them together for some purpose he intended to accomplish), an "unlinked plan" theory allows for admissibility where the actor applied the same plan or methodology to accomplish unrelated crimes.

("A word or phrase's common meaning may be discerned through examination of its dictionary definition and its legal meaning may be gleaned from its use in the *corpus juris*."), *citing Commonwealth v. Wardlaw*, 249 A.3d 937, 946-47 (Pa. 2021). Merriam-Webster relevantly defines the noun "plan" as "a **method** for achieving **an end**," "an often customary **method** of doing something : procedure," and "a detailed **formulation** of a program of action." Merriam-Webster Online Dictionary, *plan*, *available at* https://www.merriam-webster.com/dictionary/plan (last visited Jan. 26, 2026) (emphasis added). The Cambridge Dictionary offers a similar definition: "a set of decisions about **how to do something in the future**[.]" Cambridge Dictionary, *plan*, *available at* https://dictionary.cambridge.org/us/dictionary/english/plan (last visited Jan. 26, 2026) (emphasis added). The Britannica Dictionary likewise includes definitions such as "a set of actions that have been **thought of** as a way to do or achieve something" and "something that a person **intends to do**[.]" The Brittanica Dictionary, *plan*, *available* at https://www.britannica.com/dictionary/plan (last visited Jan. 26, 2026) (emphasis added). Pursuant to these plain definitions and ordinary usage of the word, a "plan" does not include conduct that is merely reactionary; there must be forethought.

The context in which the word "plan" appears further supports that the exception requires a level of forethought. *See Commonwealth v. Lopez*, 280 A.3d 887, 897 (Pa. 2022) (we do not interpret a rule's "words in isolation, but must read them with reference to the context in which they appear") (internal quotations and citation omitted); *see also* Pa.R.J.A. 112 ("Rules *in pari materia* in the same body of rules shall be construed together, if possible, as one rule[.]"). Rule 404(b) does not only prohibit using other acts to show the defendant is generally a bad person; instead, it provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's **character** in order to show that on a particular occasion the person acted in accordance with the **character**."

Pa.R.E. 404(b)(1) (emphasis added). If we zoom out further, we see Rule 404 addresses character evidence more broadly. Rule 404(a)(1) provides the general, overarching rule against using character evidence: "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." Pa.R.E. 404(a)(1).

Relevantly, Pennsylvania courts have elucidated the meaning of "character" in Rule 404's broader context, and it encompasses rather specific traits. Classic categories of character evidence include a person's law-abidingness, peacefulness, non-violence, chastity, and, for all the preceding, a lack thereof. *See, e.g.*, *Commonwealth v. Castellana*, 121 A. 50, 52 (Pa. 1923) ("general reputation reflects character and a person with a good character for peaceableness, for example, would not in all reasonable probability commit an unlawful act of violence"); *Cathcart v. Commonwealth*, 37 Pa. 108, 111-12 (Pa. 1861) ("The door was opened widely for [defendant] to show his reputation for peaceableness and regularity of conduct, and for anything that tended to show the improbability of his having perpetrated the crime of which he was accused. It was his peaceableness, his regularity of conduct, his quiet habits, his freedom from lawlessness, that were assailed. All these he had full permission to defend by adducing the opinions of his neighbours, and his general reputation."); *Commonwealth v. Luther*, 463 A.2d 1073, 1078 (Pa. Super. 1983) ("In a rape case," relevant character evidence would include "such traits as non-violence or peaceableness, quietness, good moral character, chastity, and disposition to observe good order.") (abrogated on other grounds). These examples illustrate that "character" does not simply go to whether the defendant is generally a "good guy" or a "bad guy" — it's more particular.

Reading Rule 404(b) in context, then, we know evidence of other crimes, wrongs, or acts cannot be used to prove a person's character — *i.e.*, traits such as being violent,

unlawful, unpeaceful, etc. — in order to prove they acted in conformity therewith. It thus follows that the word "plan" must require more than acting (or reacting) violently, unlawfully, unpeacefully, etc. when a triggering event occurs. Instead, and in harmony with my interpretation above, "plan" requires a level of forethought, not just a type of reaction to a certain situation. Otherwise, the line between using prior acts to establish a "plan" and using them to establish one's character (such as traits of reacting violently or unlawfully or unpeacefully) becomes untenably blurred. Consider *Arrington*, where pursuant to the logical connection test, we held it was part of the defendant's "common plan or scheme" that he "resorted to violence when his partner wanted to end a relationship or interacted with other men." 86 A.3d at 844. It is unclear how "resort[ing] to violence" in response to a certain trigger is any different from the defendant acting pursuant to his violent character. *Id.*

Indeed, that's the problem with defining an "unlinked plan" theory too loosely. According to the Office of the Attorney General's (OAG) *amicus* brief, "the concept of 'plan' should logically include an offender's opportunistic resort to criminal techniques that succeeded for him previously." OAG's *Amicus* Brief at 15; *see id.* ("A criminal plan may thus be likened to a script or playbook of criminal tactics that worked for an offender when committing past crimes."). But the phrase "criminal techniques" could cover a large swath of actions, ranging from highly specific and calculated methodologies to simply reverting to violence or dishonesty (*i.e.*, acting in accordance with one's character).[4] I submit the

_____

[4] For example, imagine a defendant charged with simple assault after getting into a disagreement with the victim, during which he punched the victim in the face. If the Commonwealth wants to introduce evidence that the defendant previously punched another person in the face during a dispute, it would technically show the defendant's "opportunistic resort to criminal techniques" — during a disagreement, the defendant punches his opponent in the face (a criminal technique) when he has the chance to strike (the opportunity). But it would be hard to seriously argue the defendant employed a common "plan." Much more clearly, it shows that when the defendant is put in a position of conflict, he reacts violently.

latter fails to satisfy Rule 404(b)'s demands. It is for this reason that I cannot fully subscribe to the OAG's position, which the dissent embraces. *See* Dissenting Opinion at 34 ("I would reiterate that other acts evidence may be admissible to demonstrate that a defendant has acted pursuant to an overarching plan or scheme to achieve results in a manner successfully utilized by him to reach an end goal in the past where [the] acts bear sufficient similarities[.]").

However, I likewise cannot join the majority's outright rejection of an unlinked plan theory in all circumstances. In fact, although appellant "urges [us] to draw the line" at a linked plan theory, even he acknowledges an unlinked plan theory could accord with Pennsylvania law if it is narrowly construed. Appellant's Reply Brief at 22-25. He argues the proper form of an unlinked plan theory would be where "the defendant develops a template or plan beforehand to use as a model for subsequent crime[,]" as the evidence would be relevant to show "preparation," an acceptable noncharacter purpose. *Id.* at 23, *quoting* Imwinkelried *et al.*, 1 COURTROOM CRIMINAL EVIDENCE §907 (2023).[5] According to appellant, more caution must be exercised with an unlinked plan theory, as "it is so difficult to differentiate between template and repeated choice cases." *Id.* at 24, *quoting* Imwinkelried *et al.*, 1 COURTROOM CRIMINAL EVIDENCE §907. To deal with that difficulty,

---

[5] Appellant and the OAG both give the example of someone who "lurk[s] in the back seats of empty cars in shopping centers as a prelude to sexual assaults[.]" *See* Appellant's Reply Brief at 23 n.12, *quoting* David P. Bryden & Roger C. Park, *"Other Crimes" Evidence in Sex Offense Cases*, 78 MINN. L. REV. 529, 547 (1994); OAG's *Amicus* Brief at 15. This hypothetical requires the perpetrator to take an affirmative step to commit the ultimate crime. Rather than simply reacting violently to an opportunity that has arisen, the defendant has created the opportunity to act violently. In turn, the defendant's creation of that opportunity (by taking some preparatory step) is itself indicative he made a plan to commit the crime. That is, he acted with forethought when he created that opportunity; he did not just stumble upon it. And perhaps he followed the same steps to achieve his end goal in each case — maybe he used a tool to break into the cars, or watched for victims who failed to lock their cars, or brought a particular weapon to threaten the victims once they got into their cars. By performing the same crime using the same methodology, he would have acted in conformance with that pre-conceived plan.

he suggests an unlinked plan "must be established by proof of a development of a methodology." *Id.* at 25.

I agree. In my view, even an "unlinked plan" could be a "plan" for purposes of Rule 404(b)'s exception. And requiring proof of the development of a methodology, as suggested by appellant, would correspond with my textual interpretation of "plan" as requiring forethought. Nevertheless, I recognize in most cases, there will likely be no direct evidence that a defendant sketched out a methodology for committing a particular crime multiple times. So the necessary follow-up question is, when does evidence of one crime establish the development of a methodology for purposes of proving a "plan" to commit another, distinct crime? To protect courts from inadvertently crossing the hazy boundary between template and propensity, the standard must be high.[6]

First, as suggested above, *see supra* at 10 n.5, courts should consider whether the defendant took an affirmative step to create the opportunity to commit the crime (*e.g.*,

---

[6] I note that, in the interest of excluding propensity evidence, we have gone beyond a mere relevance inquiry for purposes of establishing other Rule 404(b) exceptions. For example, we have explained "to be admissible under the [motive] exception, evidence of a distinct crime, even if relevant to motive, must give sufficient ground to believe that the crime currently being considered grew out of or was in any way caused by the prior set of facts and circumstances." *Commonwealth v. Roman*, 351 A.2d 214, 218-19 (Pa. 1976) (internal citation and quotations omitted). Likewise, as discussed tangentially in this case, for evidence of other crimes to be admissible to prove identity, the other crimes must be "**so nearly identical in method** as to earmark them as the handiwork of the accused[, and] **much more is demanded than the mere repeated commission of crimes of the same class** . . . . The device used must be so unusual and distinctive as to be like a **signature**." *Commonwealth v. Bryant*, 530 A.2d 83, 86 (Pa. 1987) (emphasis in original), *quoting* McCormick, EVIDENCE §190 (1972 2d ed.). Of course, evidence of a similar crime could be relevant to proving identity — relevant evidence "has any tendency to make a fact more or less probable[,]" Pa.R.E. 401(a) — but we have held that still might not be enough. *See id.*; *see also Commonwealth v. Lynn*, 192 A.3d 165, 170-71 (Pa. Super. 2018) ("[M]erely crossing the threshold of demonstrating that other-acts evidence was probative of some Rule 404(b)(2) category does not, by itself, demonstrate admissibility. . . . There is no presumption of admissibility of other-acts evidence merely because it is somewhat relevant for a non-propensity purpose.") (internal citation omitted).

breaking into a car to lurk in the back seat as a prelude to assaulting the driver). Preparatory steps, such as going to a particular location or bringing a particular weapon or supplies, tend to show a defendant is not just acting in accordance with a character trait when an opportunity arises; they show a level of forethought.

Second, and in line with the majority's analysis, a logical-connection level of similarity just doesn't cut it. Instead, I would borrow from the standard for the identity exception and require that the crimes be "nearly identical in method." *See, e.g.*, *Commonwealth v. Morris*, 425 A.2d 715, 720 (Pa. 1981), *quoting* McCormick on Evidence §190 (2d ed. 1972).[7] Certainly, the more closely a defendant's actions track his or her actions when committing another crime, the more likely it is he or she was following the steps of a plan. We have repeatedly recognized the degree of similarity in crimes increases the probative value. *See Commonwealth v. Miller*, 664 A.2d 1310, 1319 (Pa. 1995) ("the importance of the time period is inversely proportional to the similarity of the crimes in question") (abrogated on other grounds); *Commonwealth v. Shively*, 424 A.2d 1257, 1259 (Pa. 1981) ("The degree of similarity between the two incidents necessary to prove common identity of the perpetrator is thus inversely proportional to the time span between the two crimes."); *Commonwealth v. O'Brien*, 836 A.2d 966, 971 (Pa. Super. 2003) (recognizing although remoteness of prior crimes weighs against relevance, it could still be admissible if similarities were great enough).

In fact, even in *People v. Ewoldt* (a case on which the dissent relies heavily), the Supreme Court of California makes this point clear: "The principal factor affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that

---

[7] Of course, since the evidence is not being used to prove identity, there would be no need for the acts to be signature-like or especially distinct. *Cf.* Dissenting Opinion at 21 (arguing where identity is not at issue, the "similarities need not be as unique or striking as the similarities necessary for proving identity").

evidence to demonstrate the existence of a common design or plan." *People v. Ewoldt*, 867 P.2d 757, 771 (Cal. 1994). The *Ewoldt* court held such a "tendency [wa]s strong" in that case, where the "[d]efendant's uncharged misconduct . . . was committed in a manner **nearly identical** to that of two of the charged offenses, and the charged and uncharged acts together suggested a planned course of action **rather than a series of spontaneous events**." *Id.* (emphasis added). That principle continues to hold true in this context: the more similarities between the charged and other acts (whether charged or uncharged), the more probative evidence of the other acts is of a "plan." On the flip side, the more spontaneous a defendant's actions, the less likely those actions reflect a thought-out, prepared "plan" rather than a mere tendency to act in accordance with one's character.

Additionally, and markedly different from Federal Rule of Evidence 404(b)[8] and other states' comparable rules,[9] our Rules of Evidence allow other acts evidence for certain permitted purposes "**only** if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2) (emphasis added). Our Rules further recognize that character evidence is generally inadmissible because of the high risk for prejudice. *See* Pa.R.E. 404(a)(1) ("Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."); Pa.R.E. 404 cmt. ("The rationale is that the relevance of such evidence is **usually outweighed** by its tendency to create unfair prejudice, particularly

---

[8] Under the federal rules, other crimes, wrongs, or acts "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." F.R.E. 404(b)(2).

[9] In *Ewoldt*, for example, California's high court explained it examines "whether the probative value of the evidence of defendant's uncharged offenses is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" 867 P.2d at 771, *quoting* Cal. Evid. Code §352 (alterations supplied by *Ewoldt* court).

with a jury.") (emphasis added); *see also Commonwealth v. Dillon*, 925 A.2d 131, 136-37 (Pa. 2007) ("Evidence of separate or unrelated 'crimes, wrongs, or acts,' [ ] has long been deemed inadmissible as character evidence against a criminal defendant in this Commonwealth as a matter not of relevance, but of policy, *i.e.*, because of a fear that such evidence is so powerful that the jury might misuse the evidence and convict based solely upon criminal propensity."); *Commonwealth v. Burdell*, 110 A.2d 193, 195 (Pa. 1955) ("One of our most fundamental and prized principles in the administration of criminal law is that a distinct crime, except under certain special circumstances, cannot be given in evidence against a defendant who is being tried for another crime. This is because[, *inter alia*,] the effect of such testimony upon a jury is nevertheless **bound to create prejudice** and an emotional reaction on their part against the defendant.") (emphasis added). Thus, as a baseline, we assume that evidence of other crimes or bad acts is prejudicial.

In turn, since Rule 404(b) requires the probative value of the other acts evidence to outweigh its potential for unfair prejudice when it is offered for a permitted purpose, and given my reasoning above that evidence of an unlinked "plan" based on other acts is more probative if those acts are more similar to the crimes charges, we should require a high degree of similarity. Accordingly, for an unlinked plan theory to be viable under Rule 404(b), I would require: (1) evidence of a preparatory step whereby the defendant created the opportunities to commit the crimes, and (2) that the method used for commission of the crimes is nearly identical. Then, the number of those identical steps would weigh on the probative value to establishing a "plan" (the more identical steps, the greater the probative value).

In my view, the facts of this case do not establish a "plan," even one that is unlinked. As aptly summarized by the majority, differences among the crimes abound:

In two of the cases, [appellant] initiated contact with the victims; the third victim approached him. Two of the assaults occurred in the late morning; the third assault occurred near midnight. Each sexual assault occurred in a different Philadelphia neighborhood. Although [appellant] convinced all three victims to follow him to a secluded area, in one case, he held a knife to her neck while doing so. He did not otherwise physically assault that victim; however, he punched another victim, and struck the third victim with a tire iron. He forced two of the three victims to perform oral sex on him before raping them. He robbed only one victim. One rape occurred three years before the other two.

Majority Opinion at 31. These distinctions suggest appellant did not embark on his perpetration of these crimes with a predetermined plan.

By contrast, the dissent characterizes appellant's actions as "a common plan or scheme, under which he loitered on the streets of Philadelphia and near public establishments, sought out women he perceived to be vulnerable, lured them to deserted locations, and violently raped them." Dissenting Opinion at 34. But if we break down this supposed "plan," its steps crumble beneath our feet. First, the dissent does not point to specific evidence appellant was "loitering" as opposed to just being outside in Philadelphia; nor does it point to any evidence he went out (in different neighborhoods and at different times) in specific pursuit of women to rape. Second, contrary to the dissent's assertion it was his plan to "s[eek] out women he perceived to be vulnerable," *id.*, it is uncontested one of the women approached him. Third, although the dissent claims he "lured [the victims] to deserted locations," *id.*, one testified she followed him because she was "scared," N.T. Trial, 10/28/21, at 51-52 (explicitly testifying she did not follow appellant because he flashed money at her), and he brought another to a deserted location at knifepoint. And finally, the dissent notes the last step in this plan was to "violently rape[ ] them." Dissenting Opinion at 34. I do not dispute that is what happened in all three cases, but I note that final step is the commission of the crime itself. Yet as we have recognized, even under the lax standard applied in *Hicks* and its predecessors, "much more is demanded than the mere repeated commission of crimes of the same

class[.]" *Hicks*, 156 A.3d at 1125, *quoting Commonwealth v. Rush*, 646 A.2d 557, 561 (Pa. 1994). Rather than establishing a "plan," it seems to me the similarities recognized by the dissent show that when appellant encounters a vulnerable woman, he tends to react with sexual violence. *Cf. Luther*, 463 A.2d at 1078 (relevant character evidence in rape cases includes "non-violence or peaceableness, quietness, good moral character, chastity, and disposition to observe good order."). I therefore respectfully disagree with the dissent that the similarities shown on this record go beyond propensity to establish a plan.

In sum, I agree with the majority that "the trial court erred when it granted the Commonwealth's motion to consolidate [appellant]'s three rape cases for trial pursuant to the common plan, scheme, or design exception to the admission of other bad acts testimony." Majority Opinion at 58. As explained above, an unlinked plan theory is untenable on these facts, because there was no evidence of a preparatory step whereby appellant created the opportunities to commit the crimes, and the methods used for commission of the crimes were not nearly identical. Accordingly, the trial court abused its discretion in consolidating the three cases under Rule 404(b)'s "plan" exception.

However, I emphasize that "plan" is only one of the exceptions provided for in Rule 404(b)(2)'s **nonexclusive** list. *See Commonwealth v. Banks*, 521 A.2d 1, 17 (Pa. 1987) ("This list of 'special circumstances' is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury."). Indeed, I observe that in its motion to consolidate, in addition to invoking the common plan, scheme, or design exception, the Commonwealth argued the "evidence is also admissible to prove the defendant's intent, state of mind, . . . and to rebut any possible claim of accident or mistake." Commonwealth's Motion to Consolidate at 7; *see id.* at 13 (arguing if appellant

"asserts that his actions with one victim were 'misinterpreted' or implies that he mistook evidence of consent, evidence that [appellant] did identical acts with the other victims is relevant to refute that claim"); Trial Court Op. at 10 ("The joinder of the three similarly patterned cases refuted [a]ppellant's defense of consent."); *see also* Commonwealth's Brief at 16 (invoking the doctrine of chances[10] and arguing it would "hardly [be] unfair to allow the fact finder to see how enormously unlucky defendant would have to be to be falsely accused in the same way not merely once, or twice, but three times in a relatively discrete period of time").

The majority dismisses these other theories out of hand on the basis that "a court may not grant consolidation under another Rule 404(b) exception premised upon an **assumed** defense before the defendant presents that defense at trial." Majority Opinion at 36-37 (emphasis in original). Although I generally agree with this statement, the majority overlooks the fact that evidence of lack of consent was relevant at the outset of this case, regardless of whether appellant pursued a consent defense. That is because the Commonwealth bore the burden of proving "forcible compulsion" or "threat of forcible compulsion" for purposes of 18 Pa.C.S. §3121(a)(1)-(2) (Rape) and 18 Pa.C.S.

---

[10] As then-Chief Justice Saylor described it, "[a]pplication of [the doctrine of chances] depends upon the instinctive logical process that reasonably determines that unusual and abnormal events are unlikely to recur by chance." *Hicks*, 156 A.3d at 1132 (Saylor, C.J., concurring) (internal quotations and citation omitted). He elaborated "[t]he proponent does not offer the evidence of the uncharged misconduct to establish an intermediate inference as to the defendant's personal, subjective bad character. Rather, the proponent offers the evidence to establish the objective improbability of so many accidents befalling the defendant **or the defendant becoming innocently enmeshed in suspicious circumstances so frequently**." *Id.* at 1133 (emphasis in original; internal quotations and citation omitted). In other words, the doctrine asks (with some incredulity): what are the odds? Yet despite his belief "the doctrine of chances represents a non-character-based path of logical reasoning that sufficiently comports with the ideals underlying Rule of Evidence 404, as well as its express terms[,]" *id.* at 1134, then-Chief Justice Saylor also warned "the doctrine of chances must be applied with substantial caution, given the potential to associate the rationale with a propensity-based inference[,]" *id.* at 1136.

§3123(a)(1)-(2) (Involuntary Deviate Sexual Intercourse (IDSI)), and of proving appellant "engage[d] in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent[,]" 18 Pa.C.S. §3124.1 (Sexual Assault), beyond a reasonable doubt. Thus, evidence of lack of consent was necessary for the Commonwealth's case-in-chief, not just in rebuttal. *Cf. Commonwealth v. Boczkowski*, 846 A.2d 75, 88 (Pa. 2004) (the Commonwealth could introduce evidence of uncharged crime to show absence of mistake or accident even though defendant did not raise accident defense).

Moreover, as the majority relates, "the question before us concerns the (pretrial) consolidation of [appellant's] separate rape cases under the common plan, scheme, or design exception. . . . [C]onsent [ ] is not the question before us." Majority Opinion at 35 n.17. Exactly right. And for that reason, I would not opine on any hypothetical issues not before us, including whether, upon remand, the Commonwealth may properly seek to consolidate any of these cases again based on some other theory, like lack of consent or the doctrine of chances.[11] After all, it's possible the Commonwealth decides not to seek consolidation of any of the cases again; and even if it does, there's no guarantee the trial court will conclude a viable Rule 404(b) exception applies, let alone that "the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2). For

---

[11] I clarify that I do not "support joinder" of appellant's cases based on one of these other theories the Commonwealth might raise. Majority Opinion at 39 n.19. Nor do I advocate for the Court's "wholesale adoption" of the doctrine of chances. *See id.* at 38 n.19. As expressly stated above, I do not opine on such hypothetical issues or whether the Commonwealth would ultimately be successful if it were to assert one of these theories. I simply explain that I do not join the majority's purported resolution of these unripe issues and, therefore, the Commonwealth on remand is not precluded from seeking consolidation based on one of these theories, or some other theory. Indeed, the majority appears to agree. *See id.* at 39 n.19 ("we acknowledge the Commonwealth may assert other theories for consolidating the three cases upon remand"). Thus, these issues are still live.

that reason, I reserve judgment on such issues until they may actually occur and are properly presented for this Court's review in a future case.[12]

## II.    Rape Kit Reports: Confrontation Clause and Hearsay

Finally, I am compelled to respectfully dissent from the majority's holding that the rape kit reports were inadmissible pursuant to the Confrontation Clause and rule against hearsay.[13]  This is because we need not reach the issue to dispose of this case.  Given the Court's decision to remand for retrial based on its determination that the trial court erred in consolidating the three underlying cases under the common plan, scheme, or design exception, the admissibility of the evidence given at appellant's first trial is a moot point.  Moreover, it's possible the Commonwealth on the next go-around plays it safe and introduces the rape kit reports through the testimony of the forensic nurses who administered the examinations, thus avoiding the Confrontation Clause issue altogether.  As a matter of judicial restraint, then, we should not decide this question of constitutional magnitude because it is neither necessary to the outcome of this appeal nor certain to recur upon remand.  *See, e.g.*, *In re Stevenson*, 12 A.3d 273, 275 (Pa. 2010) ("as a general matter, it is better to avoid constitutional questions if a non-constitutional ground

---

[12] Similarly, in the event the Commonwealth opts to pursue separate trials upon remand, like the majority, I "offer no opinion" on the viability of a Commonwealth motion "seek[ing] to admit evidence of the other rape cases on the basis of another Rule 404(b)(2) exception."  Majority Opinion at 35-36 n.17.

[13] Although the rule against hearsay exists in our rules of evidence and does not itself implicate constitutional concerns, the majority's holding regarding hearsay hinges on its Confrontation Clause analysis.  *See* Majority Opinion at 52 ("We begin with [appellant's] Confrontation Clause challenge, as we conclude it is dispositive"); *id.* at 56 ("Our exceptions to the hearsay rule do not circumvent the requirements of the Confrontation Clause."); *id.* at 56 n.35 (rejecting Commonwealth's arguments the medical records exception or business records exception would apply based on reasoning used to find Confrontation violation: "as we determined *supra*, the primary purpose of a rape kit report — and in particular, the evidence collection information in the report — is to provide evidence for a later prosecution").

for decision is available"); *Commonwealth v. Janssen Pharmaceutica, Inc.*, 8 A.3d 267, 271 (Pa. 2010) ("it has long been the policy of this Court to avoid constitutional questions where a matter can be decided on alternative, non-constitutional grounds").

Nevertheless, in the event the issue does come up again on remand, I offer the following words of caution. Initially, it seems my colleagues in both the majority and the dissent perform their Confrontation Clause analyses by looking at the rape kit reports in their entirety. *See* Majority Opinion at 55, 55-56 n.34 ("[B]ecause the rape kit reports at issue here were offered into evidence for their truth, and their primary purpose was to provide evidence for a (potential) later criminal prosecution, [appellant] was entitled to confront the nurse examiners who completed the sexual assault examinations and signed the reports. . . . The fact that a 'rape kit report' — which documents important information for a future criminal prosecution — may also be useful in determining the appropriate medical treatment is not controlling."); Dissenting Opinion at 39 ("although the examination reports may be used in litigation of rape and sexual assault cases, that is not the primary purpose underlying their creation[;] rape kit reports are created by PSARC nurses while examining victims for the primary purpose of aiding medical personnel in identifying injuries, and providing medical treatment, testing, and emergency contraception") (emphasis omitted). I question whether this is the correct approach.

In *Smith v. Arizona*, the High Court recently stated (albeit arguably in *dicta*) that the testimonial inquiry "focuses on the 'primary purpose' of the statement, and in particular on how it relates to a future criminal proceeding. A court must therefore identify the out-of-court statement introduced, and must determine, given all the 'relevant circumstances,' the principal reason it was made." 602 U.S. 779, 800-01 (2024) (internal citations and footnote omitted). Importantly, it emphasized courts should "consider exactly which of [the non-testifying declarant's statements] are at issue." *Id.* at 801. In line with this

guidance, I believe the relevant question is not whether the rape kit report as a whole is testimonial, but whether the specific statements in the report that the Commonwealth seeks to introduce at trial are testimonial.

This is especially critical in this context because, by statute, the General Assembly established the statewide sexual assault evidence collection program with a dual purpose: "to promote the health and safety of victims of sexual assault and to facilitate the prosecution of persons accused of sexual assault." 35 P.S. §10172.3(a). As well, other jurisdictions have similarly recognized the dual purposes of sexual assault exams. *See, e.g., State v. Burke*, 478 P.3d 1096, 1108 (Wash. 2021) ("A sexual assault exam contains both forensic and medical purposes, and some statements may be more relevant to one purpose than another."). When analyzing a victim's statement to a nurse performing such an exam (known in many states as a "SANE"), it appears courts have looked closely at the context of the statements made or the characteristics of the SANE or the exam itself. *See, e.g., id.* at 1102, 1112-13 ("[T]he primary purpose of nearly all of [victim's] statements was not to provide an out-of-court substitute for trial testimony but to guide medical treatment for sexual assault. Statements patients make to medical providers are significantly less likely to be testimonial than statements given to law enforcement officers because medical personnel are not principally charged with uncovering and prosecuting criminal behavior." However, victim's "statement describing the assailant was testimonial. Its primary purpose was not to guide the medical exam but to identify the person who could be prosecuted for the sexual assault.") (internal citations and quotations omitted); *State v. Miller*, 264 P.3d 461, 486 (Kan. 2011) (whether victim's statements to SANE were testimonial was a "highly context-dependent inquiry" requiring "objective analysis of the circumstances of [victim's] encounter with the SANE, considering factors such as whether the SANE was a State actor or agent, whether there

was an ongoing emergency, whether the encounter was formal, and whether the statements and actions of both [victim] and the SANE reflect a primary purpose focusing on the later prosecution of a crime"); *State v. Hill*, 336 P.3d 1283, 1288 (Ariz. Ct. App. 2014) ("Because forensic medical examinations often have two purposes — to gather evidence for a criminal investigation and to provide medical care to the victim — whether a victim's statement in response to a question by the examiner is testimonial for purposes of the Confrontation Clause turns on whether the surrounding circumstances, objectively viewed, show that the primary purpose of the exchange at issue was to provide medical care or to gather evidence. . . . The focus always must be on the purpose of the particular exchange between the declarant and the testifying witness in which the statement was made."); *Thompson v. State*, 438 P.3d 373, 377 (Okla. Crim. App. 2019) (collecting cases and observing "[m]any courts have found a victim's statements made to medical personnel, including sexual assault examiners, describing the attack and naming the perpetrator were non-testimonial because the primary purpose of the exam was for medical treatment[,]" but others "have found that a victim's statements to a sexual assault examiner were testimonial based upon evidence of the examiner's relationship with police or involvement of the police in the exam process and the absence of any need for, or provision of, medical treatment during the exam[,]" and identifying factors to consider).

Certainly, portions of the rape kit reports at issue here involve statements made by the victims to forensic nurses, for which these cases might provide persuasive reasoning. However, other portions of the rape kit reports involve the forensic nurses' documentation of their collection of evidence. Other courts have addressed the testimonial nature of those statements somewhat differently. *See, e.g.*, *Commonwealth v. Jones*, 37 N.E.3d 589, 598 (Mass. 2015) (finding Confrontation Clause violation where testifying expert "lacked any capacity to address the chain of custody and evidence-handling protocols

relevant to the process by which the swabs were collected" and "[c]onsequently, the defendant was deprived of any opportunity to question the expert about the protocols in place to ensure that the swabs were properly collected and labeled"); *State v. Carmona*, 371 P.3d 1056, 1059 (N.M. Ct. App. 2016) ("the Confrontation Clause prohibits the admission of DNA evidence collected by an unavailable SANE and any expert testimony based thereon when the primary purpose animating the SANE's collection of such evidence is to assist in the prosecution of an individual identified at the time of the collection"); *see also Young v. U.S.*, 63 A.3d 1033, 1048 (D.C. 2013) ("without evidence that [testifying witness] performed or observed the generation of the DNA profiles . . . herself, her supervisory role and independent evaluation of her subordinates' work product are not enough to satisfy the Confrontation Clause because they do not alter the fact that she relayed testimonial hearsay"). *But see Derr v. State*, 73 A.3d 254, 272-73 (Md. 2013) (relying on common grounds from the plurality and opinion concurring in judgment in *Williams v. Illinois*, 567 U.S. 50 (2012), to hold serological exam and DNA test results based on examination of biological material taken from vaginal and other swabs were not "sufficiently formalized to be testimonial").

I do not take a position on whether the courts in these other jurisdictions are correct on these issues, but I observe they support the notion that the confrontation analysis should be more fact intensive, with a focus on the specific statements at issue and their specific context. Indeed, even appellant claims he does not seek to exclude the entire report: "Defense counsel sought to exclude **only** the rape kit part of the report prepared by the forensic nurse, with no objection to the statements made by the complainants to the nurse." Appellant's Brief at 54 (emphasis in original). But again, this Court need not undertake such an analysis today.

## III. Conclusion

In sum, regarding the first issue on which we granted review, I join the majority's abrogation of the logical connection test, as well as its holding the trial court erred when it consolidated the three underlying cases based on the common plan, scheme, or design exception. Thus, I join its vacatur of the judgment of sentence and remand for further proceedings. I respectfully dissent, however, to the extent the majority holds only a "linked plan" theory satisfies the requirements of Rule 404(b), as I believe there are circumstances where evidence of an "unlinked plan" could be relevant for permissible, non-propensity purposes. I also dissent from the majority's discussion of issues not before us, including lack of consent and the doctrine of chances. Lastly, because I do not see a need to reach the second issue, I likewise dissent from the majority's holding that the trial court "erred when it admitted the two rape kit reports into evidence absent testimony from the sexual assault nurse examiners who authored the reports." Majority Opinion at 58. I therefore join Parts I, II, III(A)-(B), and III(C)(iv) of the majority opinion, except footnote 19, and I join Part III(C)(i) to the extent it abrogates the logical connection test. As for the rest, I respectfully dissent.